T.C. Memo. 2011-209

UNITED STATES TAX COURT

ESTATE OF CLYDE W. TURNER, SR., DECEASED, W. BARCLAY RUSHTON,
EXECUTOR, Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 18911-08.                    Filed August 30, 2011.

Charles E. Hodges II and Rose K. Drupiewski, for petitioner.

Caroline R. Krivacka and Beth Nunnink, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

MARVEL, Judge:  Respondent determined a Federal estate tax
deficiency of $659,912 with respect to the Estate of Clyde W.
Turner, Sr. (estate).  The primary issue for decision is whether
the value of property Clyde W. Turner, Sr. (Clyde Sr.)
transferred to Turner & Co., a family limited partnership, is

included in his gross estate under section 2035, 2036, or 2038.[1]
We must also decide whether Clyde Sr. made additional taxable
gifts that are included in his gross estate.

FINDINGS OF FACT

I.  Background

Some of the facts have been stipulated.  We incorporate the
stipulation of facts, the first supplemental stipulation of
facts, and the second supplemental stipulation of facts into our
findings by this reference.

Clyde Sr. resided in Georgia when he died testate on
February 4, 2004.  Clyde Sr.'s longtime accountant, W. Barclay
Rushton (Mr. Rushton), was appointed executor of the estate.
When the petition on behalf of the estate was filed, Mr. Rushton
resided in Georgia.

Clyde Sr. was survived by his wife of nearly 60 years,
Jewell H. Turner (Jewell).  Clyde Sr. and Jewell had four
children:  Clyde Turner, Jr. (Clyde Jr.), Betty T. Crane
(Betty), Joyce T. Crumley (Joyce), and Janna T. Lovell (Janna).[2]
Jewell died on July 8, 2007.

---

[1]Unless otherwise indicated, all section references are to
the Internal Revenue Code, as amended, and all Rule references
are to the Tax Court Rules of Practice and Procedure.  All
monetary amounts have been rounded to the nearest dollar.

[2]For convenience, we will sometimes refer to Clyde Jr.,
Betty, Joyce, and Janna collectively as the Turner children.

## II. Clyde Sr. and His Family

Clyde Sr. was born in 1920 in Union City, Georgia, and grew up in White County, Georgia. He was drafted into the U.S. Army during World War II and was stationed in the Philippine Islands. Upon completing his military service, Clyde Sr. returned home to Georgia and went into the lumber business.

Clyde Sr. was the oldest of 10 children, and he enjoyed close, lifelong relationships with his brothers and sisters. In the late 1950s Clyde Sr. and his four brothers formed Mt. Yonah Lumber Co. (Mt. Yonah). Over the years several members of Clyde Sr.'s family worked for or became shareholders in Mt. Yonah, including Clyde Jr. and Clyde Jr.'s two sons, Marc Turner (Marc) and Travis Turner (Travis).[3] Betty, Janna, and Joyce never worked for Mt. Yonah on a permanent basis, and they have never owned shares in it.

Clyde Jr. had a domineering personality, and he adopted a negative, unpleasant attitude toward his sisters and their husbands. Moreover, Clyde Jr.'s involvement with Mt. Yonah created jealousy and resentment among his sisters and caused them to suspect that their parents favored Clyde Jr. Clyde Sr. was disappointed that his children did not have the kind of close

---

[3]As of the trial date, Travis was the chief executive officer of Mt. Yonah, and Marc had previously worked as an office manager and general manager at Mt. Yonah. Clyde Jr.'s role at Mt. Yonah as of the trial date is not clear from the record.

relationship with one another that he enjoyed with his own siblings.

In 1993 Joyce died, leaving behind two teenaged sons: Riley Crumley III (Trey) and Rory Crumley (Rory). Rory dropped out of high school a year or two after his mother's death and began abusing illegal drugs. As of the trial date, he had been arrested at least 26 times. Clyde Sr., Jewell, and the Turner children were aware of Rory's problems with drugs. Nevertheless, Rory maintained a close relationship with Jewell, and Jewell gave him money from time to time.

III. Clyde Sr.'s and Jewell's Assets

A. Regions Bank Stock

Clyde Sr. and Jewell acquired Regions Bank stock throughout their lives, and by 2002 they owned more than 170,000 shares. Clyde Sr. acquired some of the stock from his father, Ollie Turner, who was the first depositor to Peoples Bank in Cleveland, Georgia. (Peoples Bank became Regions Bank following a series of mergers in the 1980s and 1990s.) Jewell also acquired a large amount of Regions Bank stock from her father, Millard Holcombe, who served on the board of directors and was the first president of Peoples Bank. Clyde Sr. also served on the board of directors of Peoples Bank.

Because of the family ties to Regions Bank, the stock had sentimental value to Clyde Sr. and Jewell, and they sold few, if

any, shares over the years.  Moreover, the stock had greatly appreciated in value, paid dividends for many years, and was a cornerstone to Clyde Sr.'s and Jewell's accumulation of wealth.

B.  Other Assets

Clyde Sr. and Jewell maintained several bank and investment accounts, owned their home in Cleveland, Georgia, and owned investment real estate in North Carolina.  Clyde Sr. occasionally bought and sold stock, but he did not follow any particular investment strategy.  Clyde Sr. also invested in real estate from time to time with Janna's husband, John Lovell (Mr. Lovell), a professional real estate developer, and with Larry Bramblett (Mr. Bramblett), a property developer whom Clyde Sr. met in the 1990s.

C.  Life Insurance

On January 7, 1992, Clyde Sr. established the Irrevocable Trust of Clyde W. Turner, Sr. (Clyde Sr.'s Trust) to own life insurance policies for the benefit of his children and grandchildren.  Clyde Jr. and Betty were named trustees of the trust.  In 2000-2003 Clyde Sr.'s Trust had 12 beneficiaries, consisting of Clyde Sr.'s then-living children and grandchildren.

In 1992 Clyde Sr.'s Trust purchased a life insurance policy from Jackson National Life Insurance Co.  In 1997 Clyde Sr.'s Trust purchased a life insurance policy from Sun Financial Life.  On a date that is not disclosed in the record, Clyde Sr.'s Trust purchased a State Farm life insurance policy.

Item 3 of Clyde Sr.'s Trust agreement provided that Clyde Sr., as well as others, had the right to add to the trust at any time by, inter alia, depositing money, insurance policies, or any other property with the trustees. Clyde Sr. did not transfer money to the trustees of Clyde Sr.'s Trust to pay the life insurance premiums in 2000-2003. Instead, Clyde Sr. paid the premiums directly from a joint checking account he shared with Jewell.[4] Clyde Sr. made the following premium payments in 2000-2003:

| | Premium Payments | | | |
| Policy | 2000 | 2001 | 2002 | 2003 |
|---|---|---|---|---|
| Jackson National Life | -0- | $13,645 | $13,645 | $13,645 |
| Sun Financial Life | $16,678 | 16,678 | 16,678 | 16,678 |
| State Farm | -0- | 4,266 | -0- | -0- |

Item 3 of Clyde Sr.'s Trust agreement provided that after each direct or indirect transfer to the trust that was treated as a gift for Federal gift tax purposes, each beneficiary, i.e., each then-living child and grandchild of Clyde Sr., had the absolute right and power to withdraw from the trust the lesser of (1) $20,000 ($10,000 if the beneficiary was not married at the time of the withdrawal), minus the total amounts previously withdrawn by that beneficiary during the same calendar year, or (2) the amount of the transfer, divided by the number of

---

[4]Clyde Sr. did not report the premium payments as gifts on his 2002 or 2003 Form 709, United States Gift (and Generation-Skipping Transfer) Tax Return.

beneficiaries.  A beneficiary wishing to make a withdrawal from Clyde Sr.'s Trust was required to give notice of his exercise of the withdrawal right within 30 days of the transfer to the trust giving rise to such right.  Upon timely receipt of a request for withdrawal, the trustees of Clyde Sr.'s Trust were required to distribute from the trust the amount necessary to satisfy the request.  For this purpose, the trustees were authorized to distribute cash or any other trust property or to borrow against the cash value of any insurance policy to obtain cash for the distribution.  There is no evidence in the record that any of the beneficiaries ever requested or made withdrawals from Clyde Sr.'s Trust before Clyde Sr.'s death.

D.    Management of Clyde Sr. and Jewell's Finances

In approximately 1994 Marc began helping Clyde Sr. and Jewell with their bookkeeping and finances.  Sometime in 2001 Clyde Sr. and Jewell called Marc and asked him to meet with them to discuss their assets.  Marc recalled the meeting as follows:

> I sat down at their kitchen table, where we always met for our talks * * *, and my grandparents shared with me that they realized that neither one of them was getting any younger, and that they realized that their assets and their investments were really in a scrambled situation, * * * and they asked me to--if I would please help them come up with a way to manage their assets, to pool their assets together, to come up with an idea, a vehicle to come forth and be able to take care of business for them.

Soon after the meeting between Marc and his grandparents, Marc and Travis contacted an attorney at Stewart, Melvin & Frost,

a Gainesville, Georgia, law firm that had previously done estate planning work for Clyde Sr. and Jewell. In early 2002 Clyde Sr., Jewell, Marc, and Travis met with attorneys from the firm. Clyde Sr. was in his early eighties at the time of the meeting, and Jewell was in her late seventies, but both were in good health. Clyde Jr., Betty, and Janna did not attend the meeting.

On March 27, 2002, James Coyle (Mr. Coyle), an attorney from Stewart, Melvin & Frost, sent a letter to Clyde Sr. and Jewell regarding formation of a family limited partnership and the contribution of assets to the partnership. Mr. Coyle explained in the letter that "A key element to a gifting plan is the need of a sound appraisal of the partnership for tax purposes".

IV. Turner & Co.

A. Formation

On April 15, 2002, Clyde Sr. and Jewell established Turner & Co. as a Georgia limited liability partnership by filing a certificate of limited partnership. The Agreement of Limited Partnership of Turner & Company, L.P. (partnership agreement), provided that Clyde Sr. and Jewell each would own a 0.5-percent general partnership interest and a 49.5-percent limited partnership interest.

After Clyde Sr.'s death, the Turner family held meetings, on November 5, 2004, and November 19, 2005, to discuss Turner & Co.'s past performance and future investment plans. The meetings

also included discussions of Clyde Sr.'s estate and the provisions of his will.[5]

B.   Contributions

In 2002 Clyde Sr. and Jewell each contributed assets to Turner & Co. with a fair market value of $4,333,671 (total value $8,667,342).   The list of assets to be contributed was not finalized until at least July 2002, and the transfers were not completed until at least December 2002.

The contributed assets consisted of:  (1) Cash, (2) shares of Regions Bank common stock, (3) shares of NBOG Bancorporation stock, (4) shares of Friends Bank stock, (5) shares of Southern Heritage Bancorp stock, (6) 21 certificates of deposit at Habersham Bank, (7) one certificate of deposit at Regions Bank, (8) five certificates of deposit at United Community Bank, (9) assets held in an account at Morgan Keegan with an account number ending in 5768,[6] (10) assets held in a securities account at Wachovia with an account number ending in 783,[7] (11) assets held

_____

[5]The record is not clear whether the Turner family held any meetings to discuss Turner & Co.'s performance before Clyde Sr.'s death.  Although Marc and Betty suggested they did, no objective evidence corroborates their statements.

[6]These assets consisted of three annuities, shares of Alabama Power preferred stock, shares of Colonial Capital Trust preferred stock, shares of ING Group preferred stock, and 100 shares of Regions Financial stock.

[7]These assets consisted of preferred stock of Duke Energy Corp.

in a securities account at Wachovia with an account number ending in 276,[8] and (12) assets held in an account at the GMS Group with an account number ending in 3160.[9]  Overall, the contributed property included 154,506 shares of Regions Bank common stock, which accounted for nearly 60 percent of the value of all property contributed to Turner & Co.  The Regions Bank stock contributed to Turner & Co. represented approximately 0.06 percent of Regions Bank's total outstanding stock.  Clyde Sr. and Jewell did not contribute to Turner & Co. any interest in an operating business or in a regularly conducted real estate activity that required active management.

The Turner & Co. partnership interests that Clyde Sr. and Jewell received in exchange for their contributions of property were proportionate to the fair market value of the assets contributed.  All of the assets that Clyde Sr. and Jewell contributed to Turner & Co. were properly titled in the name of Turner & Co.

Clyde Sr. and Jewell retained more than $2 million of assets that were not contributed to Turner & Co., including but not

---

[8]These assets consisted of preferred stock of BAC Capital Trust II, class A shares of Ingles Markets, bonds issued by Caterpillar Financial Services Corp., and preferred stock of Duke Energy Corp.

[9]These assets consisted of cash, 2,000 shares of Regions Bank stock, bonds issued by Gainesville, Georgia, and bonds issued by Fulton County, Georgia.

limited to their residence in Cleveland, Georgia, investment real estate in North Carolina, cash and certificates of deposit, and 24,012 shares of Regions Bank stock.  The retained assets, together with Social Security income, generated annual income of at least $90,000--more than enough to pay Clyde Sr. and Jewell's living expenses.

C.  Partnership Agreement Provisions

The partnership agreement listed three general purposes for creation of Turner & Co.:  (1) To make a profit, (2) to increase the family's wealth, and (3) to provide a means whereby family members can become more knowledgeable about the management and preservation of the family's assets.  To facilitate the general purposes, the partnership agreement listed nine specific purposes for formation of Turner & Co.:

> (a) To provide for control of family assets within one or more entities by providing an orderly succession of management and to assure management by the best qualified person(s);
>
> (b) To consolidate or eliminate fractional interests in realty and other family assets to promote greater sales potential;
>
> (c) To provide a means whereby gifts can be made without creating fractional interests;
>
> (d) To provide a means whereby family assets can be protected against persons outside the family acquiring rights or interests in family assets;
>
> (e) To provide protection of family members against future creditors being able to reach family assets;

(f) To avoid the loss of family member's interest in family assets as a result of failed marriages;

(g) To enhance the knowledge and communication of family members concerning investment and management of family assets;

(h) To provide structure and procedures to reduce the likelihood of deadlock and dispute among family members; [and]

(i) To provide structure and controls to reduce the potential of family members transferring their interests in the partnership without first offering that interest to the other family members.

The partnership agreement was modeled on a standard form that Stewart, Melvin & Frost used when drafting partnership agreements. Consequently, some of the purposes listed in the partnership agreement did not apply to the Turner family,[10] and Clyde Sr. and Jewell's actual purposes for establishing Turner & Co. were not necessarily reflected in the partnership agreement. Nevertheless, section 1.3 of the partnership agreement provided, inter alia, that "The General Partner shall effectuate the purposes of the Partnership and operate it in accordance with the purposes of the Partnership and in accordance with its fiduciary duties and the rights and powers granted it in this Agreement."

Other pertinent provisions of the partnership agreement were as follows.

---

[10]For example, the partnership agreement provides that one of the goals of the partnership is to consolidate or eliminate fractional interests in realty. However, Clyde Sr. and Jewell did not contribute any interests in real property, fractional or otherwise, to Turner & Co.

- Section 4.1 provided that "the General Partner shall be the sole manager of the Partnership and have sole authority in the conduct and management of the business of the Partnership."

- Section 4.4 provided that the general partner would manage the partnership in a businesslike manner and that the general partner shall maintain complete and accurate books and records with respect to the partnership and furnish reports to the limited partners.

- Section 4.6 provided that the general partner, and not the partnership, would pay all operating expenses of the partnership (other than interest expenses) including but not limited to organizational expenses, legal fees, investment fees, management charges, accounting fees, and other operating costs. In consideration of the general partner's payment of such obligations, the general partner was entitled to a special allocation of income in an amount to be determined in good faith by the general partner. In addition, the general partner was entitled to "a reasonable management charge".[11]

---

[11]Notwithstanding sec. 4.6 of the partnership agreement, Clyde Sr. and Jewell chose not to pay Turner & Co. expenses from their personal funds but chose to receive a $2,000-per-month management fee. Turner & Co. treated the monthly management fees as nondeductible distributions rather than deductible expenses.

- Section 4.7 provided that in the event of death or incapacity of either of the general partners, i.e., Clyde Sr. or Jewell, the surviving general partner would become the sole general partner. Thereafter, in the event of the death or incapacity of the surviving general partner, Marc and Travis, or the survivor between them, would become the new general partner.

- Section 8.1 provided:

  The net cash flow of the Partnership for each tax year shall be distributed to each Limited Partner * * * and General Partner pro rata to the extent of each Partner's federal and state income tax liability attributable to the taxable income of the Partnership. * * * <u>The balance of the net cash flow, if any, may be distributed to each Limited Partner and General Partner pro rata at such times and in such amounts as determined by the General Partner in its sole and absolute discretion</u>, considering the investment and reinvestment opportunities and cash needs of the partnership. [Emphasis added.]

- Section 8.2 provided that the partnership could make distributions in kind of partnership assets, in the sole and absolute discretion of the general partner, in accordance with and pursuant to section 1.704-1(b)(2)(iv)(e)(1), Income Tax Regs.

- Section 9.1 provided that the general partner could terminate or dissolve the partnership, but only after the sale or disposition of all or substantially all partnership assets.

- Section 9.2 provided that upon a termination or dissolution of the partnership the general partner would distribute the proceeds from the sale or distribution of partnership assets in the following order of priority:  (1) Payments to creditors, in the order of priority provided by law; (2) payments to limited partners with respect to their share of partnership profits; (3) payments to limited partners with respect to their capital contributions; (4) payments to the general partners other than for capital and profits; (5) payments to the general partners with respect to profits; and (6) payments to the general partners with respect to capital.

- Section 11.1 provided that the general partner could amend the partnership agreement at any time without the consent or approval of the limited partners.

D.   Management

On or about April 24, 2002, Clyde Sr. and Jewell, as the general partners of Turner & Co., signed a Management Fee Agreement of Turner & Company, L.P. (management fee agreement). The management fee agreement provided that the general partners would allocate $500 per month of their management fee to each of Marc and Travis in exchange for Marc's and Travis' providing daily management services to Turner & Co.  The management fee

agreement described Marc's and Travis' daily management services as "any and all tasks and duties assigned to Marc and Travis by the General Partner."

Turner & Co. made payments to Marc and Travis of $2,500 each in 2002, $5,500 each in 2003, and $7,000 each in 2004. Clyde Sr. signed those checks on behalf of Turner & Co. through September 2003.[12]

In January 2003 Clyde Sr. submitted a statement to Mr. Rushton that the payments to Marc and Travis should be classified as "a gift of appreciation." After January 2003 Clyde Sr. wrote the word "gift" on the memo line of each of the checks he wrote to Marc and Travis. Turner & Co. did not treat the payments to Marc and Travis as deductible expenses and did not issue a Form W-2, Wage and Tax Statement, or a Form 1099-MISC, Miscellaneous Income, to Marc or Travis in 2002-04. Marc and Travis did not report the payments as income on their 2002-04 Federal income tax returns.

E.    Gifts of Limited Partnership Interests and Amendments
      to Partnership Agreement

On December 31, 2002, and January 1, 2003, Clyde Sr. and Jewell gave limited partnership interests in Turner & Co. to their three children and to Joyce's children. According to the

---

[12]Clyde Sr. became seriously ill and was hospitalized in October 2003, and all of the checks written to Marc and Travis thereafter were signed by Marc, Travis, or Jewell, or some combination thereof.

gift transfer documents, the aggregate fair market values of the partnership interests transferred on December 31, 2002, and January 1, 2003, were $1,652,315 and $474,315, respectively. The values were derived from a valuation by Willis Investment Counsel dated May 18, 2004, and were added to the gift transfer documents on or after that date. No values appeared on the gift transfer documents when the documents were signed.

Because of their concerns about Rory's drug addiction and legal problems, Clyde Sr. and Jewell established the Irrevocable Trust f/b/o Rory Crumley (Rory's Trust) to own assets for Rory's benefit. Habersham Bank was appointed trustee of Rory's Trust. Rory's limited partnership interest in Turner & Co. was immediately transferred to Rory's Trust.

Turner & Co. had the following ownership structure before and after the gifts of limited partnership interests:

|  | Percentage Ownership Interest | | |
| General Partner: | 12/30/2001 | 12/31/2002 | 1/1/2003 |
|---|---|---|---|
| Clyde Sr. | [1]0.5 | 0.5 | 0.5 |
| Jewell | 0.5 | 0.5 | 0.5 |
| | | | |
| Limited Partner: | | | |
| | | | |
| Clyde Sr. | 49.5 | 32.6 | 27.8 |
| Jewell | 49.5 | 32.6 | 27.8 |
| Clyde Jr. | 0.0 | 8.4 | 10.8 |
| Betty | 0.0 | 8.4 | 10.8 |
| Janna | 0.0 | 8.4 | 10.8 |
| Trey | 0.0 | 4.3 | 5.5 |
| Rory's Trust | 0.0 | 4.3 | 5.5 |

[1]All percentage figures have been rounded to the nearest one-tenth of 1 percent.

On October 13, 2004, Mr. Rushton filed gift tax returns on behalf of the estate with respect to Clyde Sr.'s transfers of limited partnership interests in Turner & Co. to his children and grandchildren. The values of the gifts reported on the returns were derived from the valuation by Willis Investment Counsel dated May 18, 2004. On the Forms 709 the estate did not make gift-splitting elections under section 2513.

One day before the first of the transfers, on December 30, 2002, Clyde Sr., Jewell, Clyde Jr., Betty, and Janna signed an amendment to the partnership agreement. Betty and Janna insisted on the amendment because they were uncomfortable with Marc's and Travis' becoming the successor general partners of Turner & Co. and playing such a large role in the partnership.

The amendment provided, in relevant part, that Clyde Jr., Janna, and Betty would become the successor general partners of Turner & Co. following the death of the last to die of Clyde Sr. and Jewell. The amendment further provided that Clyde Jr. could appoint Marc or Travis, or both, to serve as a general partner in his place. However, if Clyde Jr. appointed Marc and Travis they would have only one vote combined, while Betty and Janna would have one vote each. Finally, the amendment provided that at any time following the death of the last to die of Clyde Sr. and Jewell, any of the following individuals could require Turner & Co. to undergo a tax-free reorganization to create five separate

partnerships:  Clyde Jr., Betty, Janna, Trey, and Habersham Bank, as trustee for Rory's Trust.  In that event, the amendment required that Turner & Co.'s liquid assets be divided among the separate partnerships pro rata and that any illiquid assets be sold and the proceeds divided pro rata.[13]

F.    Partnership Operations

In 2002-04 Turner & Co. maintained investment accounts at the GMS Group, Morgan Keegan, and Wachovia Securities and a checking account at United Community Bank.  Turner & Co.'s GMS Group account statements reflect no change in the securities held between December 2002 and Clyde Sr.'s death in February 2004.  The Morgan Keegan account statements reflect that dividends paid to Turner & Co. with respect to the assets held in that account were reinvested in a money market fund between January and September 2003.  The Morgan Keegan account statements also reflect a handful of asset purchases and sales.  For example, in January 2003 Turner & Co. purchased 1,941 shares of Ford Motor Credit preferred stock for $49,981.  In June 2003 Turner & Co. purchased 10,000 additional shares of Ford Motor Credit preferred stock for a total purchase price of $259,000.  Turner & Co. also purchased $250,000 of GMAC Notes in August and September 2003,

---

[13]On Sept. 18, 2006, Jewell authorized the establishment of four separate partnerships:  One for each of her surviving children and one for Trey and Rory.  Turner & Co. was dissolved effective Jan. 8, 2009.

and $50,000 of General Electric notes on September 11, 2003. Turner & Co. did not make any purchases or sales in the Morgan Keegan account between October 2003 and Clyde Sr.'s death. Turner & Co.'s Wachovia Securities account statements reflect a purchase of $5,000 of GMAC Notes on December 26, 2002,[14] $2,500 of Morgan Stanley preferred stock on February 22, 2003, $5,000 of Ford Motor preferred stock on March 6, 2003, and $14,500 of Suburban Propane stock on June 13, 2003.  Turner & Co.'s Wachovia Securities account statements do not reflect any other purchases or sales in 2002-04 before Clyde Sr.'s death.  Turner & Co. did not make any trades in any of its investment accounts between October 2003, when Clyde Sr. became seriously ill, and his death in February 2004.

Turner & Co. did not sell any Regions Bank stock in 2002-04 because Clyde Sr. and Jewell had a sentimental attachment to the stock and Marc and Travis could not convince them to sell it. Regions Bank paid cash dividends with respect to its stock in 2002-04, and Turner & Co. invested most or all of the dividends in money market funds.

---

[14]The purchase of $5,000 of GMAC Notes resulted in a negative cash balance in the account.  The Wachovia Securities account statement reflects receipt of $5,000 on Jan. 3, 2003.  On Jan. 9, 2003, Turner & Co. wrote a check to Clyde Sr. for $5,000. The memo line of the check states that it relates to "Wachovia-General Motors".

Turner & Co.'s checking account statements reflect multiple payments to Stewart, Melvin & Frost in 2002-04. Most of the payments related to legal work performed by the law firm for Turner & Co. However, at least some of the payments related to legal services provided to Clyde Sr. and Jewell with respect to their estate planning.

In 2002 and 2003 Turner & Co. participated in two real estate transactions. On August 23, 2002, Turner & Co., Mr. Lovell, and Mr. Bramblett purchased adjoining parcels of land in Jackson County, Georgia (the Jackson County property). Mr. Bramblett found the Jackson County property and did all the legwork necessary to get the property ready for sale. Mr. Lovell's role in the deal was to find a developer to purchase the property.

The Jackson County property consisted of 71.25 acres of land with improvements. The total purchase price for the Jackson County property was $399,011. To finance the purchase, Turner & Co. borrowed $171,025 from United Community Bank. The loan was secured by two certificates of deposit owned by Turner & Co. Turner & Co. used partnership assets to fund the balance of the purchase price. Mr. Lovell and Mr. Bramblett each signed a security deed notice for $100,224, representing their portions of the purchase price. Also on August 23, 2002, Turner & Co., Mr. Lovell, and Mr. Bramblett sold a 22.6-percent interest in the

Jackson County property for a profit to Mahmoud Mohamed (Mr. Mohamed).

On September 9, 2002, Clyde Sr. paid Turner & Co.'s $171,543 outstanding debt to United Community Bank from his personal checking account. Neither Clyde Sr. nor Turner & Co. executed a written agreement regarding Clyde Sr.'s payment of the partnership's debt. Marc and Travis did not inform Turner & Co.'s accountant, Sally Walden-Crowe (Ms. Walden-Crowe), or anyone else at her firm that Clyde Sr. had personally repaid a partnership loan. Ms. Walden-Crowe, who was gravely ill and was out of the office for several months, did not learn that Clyde Sr. had repaid the loan until October 2003, at which point she updated Turner & Co.'s general ledger to reflect a $171,543 debt owed to Clyde Sr.

On February 17, 2003, Turner & Co., Mr. Lovell, Mr. Bramblett, and Mr. Mohamed sold the Jackson County property for $605,642. Mr. Bramblett and Mr. Lovell used their shares of the proceeds to repay the security deed notes, plus accrued interest.

On February 5, 2003, Turner & Co., Mr. Lovell, and Mr. Bramblett purchased 17.01 acres on Lake Hartwell (the Lake Hartwell property) in Hart County, Georgia, for $363,188. Once again, Mr. Bramblett found the property and did all the legwork necessary to prepare the property for sale, and Mr. Lovell's role was to find a developer to purchase the property.

Turner & Co. was unable to obtain a loan by the date of the closing. As a result, Clyde Sr. attended the closing and wrote a personal check for $363,188 to fund the purchase. The following day, Turner & Co. received a loan disbursement of $363,238 from Habersham Bank and immediately repaid Clyde Sr. Turner & Co. received Deeds to Secure Debt from Mr. Lovell and Mr. Bramblett in the amounts of $127,729 and $107,729, respectively, to secure their shares of the purchase price. Mr. Bramblett paid $20,000 for the removal of a boat dock on the Lake Hartwell property. On February 18, 2003, Turner & Co. used its share of the proceeds from the sale of the Jackson County property to repay the loan to Habersham Bank.

The Lake Hartwell property was developed into a subdivision consisting of five 1.25-acre lots with lake access and one 10-acre lot with no lake access. Turner & Co. sold one of the 1.25-acre lots on June 2, 2003, for $92,500, and Mr. Lovell's and Mr. Bramblett's shares of the proceeds were applied to reduce their outstanding notes to Turner & Co. Two additional 1.25-acre lots were sold on June 20, 2003, and Mr. Lovell's and Mr. Bramblett's shares of the proceeds were again applied to reduce their debt to Turner & Co. Finally, on December 28, 2004, Turner & Co. sold the 10-acre lot and another 1.25-acre lot for $180,000, and Mr. Lovell's and Mr. Bramblett's shares of the proceeds were applied

to satisfy their liability to Turner & Co., including accrued interest.[15]

G.    Partnership Payments to Clyde Sr. and Jewell

Turner & Co. made the following payments to Clyde Sr. in 2002:

| Date | Amount |
|------|--------|
| 8/26 | $2,000 |
| 9/10 | 3,000 |
| 9/13 | 6,500 |
| 9/23 | 2,000 |
| 9/30 | 2,000 |
| 10/1 | 26,000 |
| Total | 41,500 |

Turner & Co. did not make any payments to Jewell in her capacity either as a general partner or as a limited partner, or to any other limited partner in 2002.  The 2002 Schedules K-1, Partner's Share of Income, Credits, Deductions, etc., reflected distributions to Clyde Sr., as general partner, of $235; Jewell, as general partner, of $235; Clyde Sr., as limited partner, of $23,277; and Jewell, as limited partner, of $23,276.[16]

---

[15]The remaining 1.25-acre lot was sold on May 13, 2005.

[16]We infer that the $5,500 paid to Marc and Travis in 2002 was treated as a distribution to Clyde Sr. and Jewell, which would help explain the disparity between the $41,500 paid to Clyde Sr. and Jewell in 2002 and the $47,023 of total distributions reported on Turner & Co.'s 2002 Form 1065, U.S. Return of Partnership Income.  The record does not explain the additional $23 disparity.

Turner & Co. made the following payments to Clyde Sr. and Jewell in 2003:[17]

| Date | Payee | Amount | Memo |
|------|-------|--------|------|
| 1/9 | Jewell | $2,000 | Draw |
| 1/13 | Clyde Sr. | 5,000 | Wachovia General Motors |
|  | Clyde Sr. | 46,170 | Estimated Federal & State taxes |
| 1/30 | Jewell | 2,000 | Draw |
| 2/22 | Clyde Sr. | 13,645 | Jackson National Life |
| 3/1 | Jewell | 2,000 | Draw |
| 4/1 | Jewell | 2,000 | Draw |
| 5/1 | Jewell | 2,000 | Draw |
| 6/2 | Jewell | 2,000 | June draw |
| 7/1 | Jewell | 2,000 | July draw |
| 9/2 | Jewell | 2,000 | Monthly draw |
| 9/29 | Jewell | 2,000 | October draw |
| 11/3 | Jewell | 2,000 | November draw |
| 12/1 | Jewell | 2,000 | December draw |
| Total |  | 86,815 |  |

---

[17]The listed payments do not include $363,188 Turner & Co. paid to Clyde Sr. on Feb. 6, 2003, to reimburse him for the personal funds he used to purchase the Lake Hartwell property.

Turner & Co. did not make any payments to any other limited partners in 2003. As indicated above, the $46,170 payment to Clyde Sr. on January 13, 2003, was intended to pay Federal and State tax attributable to Clyde Sr.'s and Jewell's income from Turner & Co.[18] The $13,645 payment to Clyde Sr. on February 22, 2003, was intended to pay the annual premium for the Jackson National Life insurance policy owned by Clyde Sr.'s Trust for the benefit of Clyde Sr.'s children and grandchildren.

Turner & Co.'s 2003 Form 1065 did not report any distributions to any of the general or limited partners. Instead, Turner & Co. took the position that all payments to Clyde Sr. and Jewell in 2003 reduced the balance of the loan that was recorded on the partnership books to reflect Clyde Sr.'s payment of Turner & Co.'s $171,542 debt to United Community Bank.

---

[18]On their 2002 Federal income tax return, Clyde Sr. and Jewell reported total income from Turner & Co. of $91,477.

Turner & Co. made the following payments in 2004:

| Date | Payee | Amount | Memo |
|------|-------|--------|------|
| 1/1 | Jewell | $2,000 | January draw |
| 2/2 | Jewell | 2,000 | February 2004 draw |
| 3/1 | Jewell | 2,000 | March draw |
| 3/31 | Jewell | 2,000 | April draw |
| 4/8 | IRS | 5,312 | Irrevocable trust--Rory Crumley |
| 4/8 | State of Georgia | 911 | Irrevocable trust--Rory Crumley |
| 4/9 | Jewell | 58,000 | Draw to purchase car |
| 4/12 | Estate of Clyde Sr. | 32,152 | |
| 4/12 | Jewell | 32,152 | |
| 4/12 | Clyde Jr. | 12,267 | |
| 4/12 | Trey | 6,223 | |
| 4/16 | Janna Lovell | 12,267 | Cover 2003 taxes |
| 4/19 | Betty | 12,267 | Cover 2003 taxes |
| 5/1 | Jewell | 2,000 | May draw |
| 5/20 | Clyde Jr. | 16,000 | Distribution |
| 5/20 | Janna | 16,000 | Distribution |
| 5/20 | Trey | 8,000 | Distribution |
| 5/20 | Rory's Trust | 8,000 | Distribution |
| 5/20 | Betty | 16,000 | Distribution |
| 5/29 | Jewell | 2,000 | June draw |
| 6/29 | Jewell | 2,000 | July draw |
| 8/2 | Jewell | 2,000 | August draw |
| 9/1 | Jewell | 2,000 | September draw |
| 10/1 | Jewell | 2,000 | October draw |
| 11/1 | Jewell | 2,000 | Draw |
| 11/4 | Jewell | 94,308 | |
| 11/4 | Clyde Jr. | 18,000 | |
| 11/4 | Janna | 18,000 | |
| 11/4 | Betty | 18,000 | |
| 11/4 | Trey | 9,000 | |
| 11/4 | Rory's Trust | 9,000 | |
| 11/8 | Clyde Jr. and Betty, cotrustees | 4,170 | |
| 12/1 | Jewell | 2,000 | Draw |

## V. Clyde Sr.'s Death

Clyde Sr. became seriously ill and was hospitalized in October 2003.  He died on February 4, 2004.  The estate obtained

an appraisal of the 0.5-percent general partnership interest and the 27.8-percent limited partnership interest in Turner & Co. that Clyde Sr. owned at his death. On Schedule F, Other Miscellaneous Property Not Reportable Under Any Other Schedule, of the estate tax return, the estate reported the general and limited partnership interests had values of $30,744 and $1,578,240, respectively.

On or about August 4, 2008, respondent issued a notice of deficiency to the estate in which he determined that the values of the assets Clyde Sr. transferred to Turner & Co. were included in his gross estate under sections 2035, 2036, and 2038. In the notice of deficiency respondent determined that Turner & Co.'s net asset value as of February 4, 2004, was $9,488,713 and that one-half of that amount was included in Clyde Sr.'s gross estate. The parties now appear to agree that Turner & Co.'s net asset value as of February 4, 2004, was as follows:[19]

_____

[19]In the reply brief petitioner does not object to respondent's proposed finding of fact regarding Turner & Co.'s net asset value as of Feb. 4, 2004.

| Asset | Value |
|---|---|
| Cash and cash equivalents | $2,390,023 |
| Regions Bank stock | 5,655,692 |
| Other common stock (public) | 26,758 |
| Other common stock (private) | 4,810 |
| Preferred stock | 477,083 |
| Corporate bonds | 310,069 |
| Municipal bonds | 68,731 |
| Annuities | 459,503 |
| Notes receivable | 69,518 |
| Real estate | 118,333 |
| Total | 9,580,520 |

In the notice of deficiency respondent also reduced the total adjusted taxable gifts reported on the Form 706, United States Estate (and Generation Skipping Transfer) Tax Return, by the amounts of Clyde Sr.'s gifts of limited partnership interests to his children and grandchildren. Respondent included in the total adjusted taxable gifts the premiums paid on life insurance policies owned by Clyde Sr.'s Trust for the benefit of Clyde Sr.'s children and grandchildren.

OPINION

I.  Burden of Proof

In general, the Commissioner's determinations are presumed correct, and the taxpayer bears the burden of proving that they are incorrect. Rule 142(a); INDOPCO, Inc. v. Commissioner, 503 U.S. 79, 84 (1992); Welch v. Helvering, 290 U.S. 111, 115 (1933). However, if in any court proceeding a taxpayer introduces credible evidence with respect to any factual issue relevant to ascertaining the taxpayer's liability for any tax imposed by

subtitle A or B of the Internal Revenue Code and meets certain other requirements, the burden with respect to that factual issue shifts to the Commissioner.  Sec. 7491(a).

Petitioner argues that section 7491(a) shifts the burden to respondent because petitioner has introduced credible evidence with respect to every factual issue.  Respondent counters that section 7491(a) does not apply because petitioner did not comply with respondent's reasonable requests for information during informal discovery, which necessitated the use of formal discovery procedures.  We need not decide whether section 7491(a) applies to the material factual issues in this case because our resolution of the issues is based on the preponderance of the evidence rather than on the allocation of the burden of proof. See Knudsen v. Commissioner, 131 T.C. 185, 189 (2008).

II.  Section 2036

Section 2001(a) imposes a tax "on the transfer of the taxable estate of every decedent who is a citizen or resident of the United States."  The taxable estate, in turn, is defined as "the value of the gross estate", less applicable deductions. Sec. 2051.  Section 2031(a) provides that the gross estate includes "all property, real or personal, tangible or intangible, wherever situated", to the extent provided in sections 2033 through 2046.

Section 2033 broadly provides that the value of the gross estate includes the value of all property to the extent of the decedent's interest in that property at the time of death. Sections 2034 through 2036 require inclusion in the gross estate of several specific classes of assets. Section 2036(a), which is one such specific section, provides:

> SEC. 2036. TRANSFERS WITH RETAINED LIFE ESTATE.
>
> (a) General Rule.--The value of the gross estate shall include the value of all property to the extent of any interest therein of which the decedent has at any time made a transfer (except in case of a bona fide sale for an adequate and full consideration in money or money's worth), by trust or otherwise, under which he has retained for his life or for any period not ascertainable without reference to his death or for any period which does not in fact end before his death--
>
> > (1) the possession or enjoyment of, or the right to the income from, the property, or
> >
> > (2) the right, either alone or in conjunction with any person, to designate the persons who shall possess or enjoy the property or the income therefrom.

The purpose of section 2036(a) is to include in a decedent's gross estate the values of inter vivos transfers that were "essentially testamentary" in nature. See United States v. Estate of Grace, 395 U.S. 316, 320 (1969) (interpreting section 811(c)(1)(B) of the Internal Revenue Code of 1939, a predecessor to section 2036). The Supreme Court has defined as "essentially testamentary" those "transfers which leave the transferor a significant interest in or control over the property transferred

during his lifetime." Id. Courts have held that "Section 2036 describes a broad scheme of inclusion in the gross estate, not limited by the form of the transaction, but concerned with all inter vivos transfers where outright disposition of the property is delayed until the transferor's death." Guynn v. United States, 437 F.2d 1148, 1150 (4th Cir. 1971).

Section 2036(a) applies when three conditions are satisfied: (1) The decedent made an inter vivos transfer of property, (2) the decedent's transfer was not a bona fide sale for adequate and full consideration, and (3) the decedent retained an interest or right enumerated in section 2036(a)(1) or (2) or (b) in the transferred property that he did not relinquish before his death. Sec. 2036(a); Estate of Bongard v. Commissioner, 124 T.C. 95, 112 (2005). If these conditions are met, the full value of the transferred property is included in the value of the decedent's gross estate. Estate of Bongard v. Commissioner, supra at 112. We now turn to consideration of each of these three conditions.

A. Whether There Was a Section 2036(a) Transfer

Clyde Sr. made an inter vivos transfer of property when he transferred assets to Turner & Co. in exchange for a 0.5-percent general partnership interest and a 49.5-percent limited partnership interest.

B.  Whether the Transfer Was a Bona Fide Sale for Adequate and Full Consideration

Congress excepted from section 2036(a) any transfer of property otherwise subject to that section that is a bona fide sale for adequate and full consideration (the bona fide sale exception).  Estate of Bongard v. Commissioner, supra at 113.  The applicability of the bona fide sale exception depends on two requirements:  (1) A bona fide sale, meaning an arm's-length transaction,[20] and (2) adequate and full consideration.  See id. at 114; Estate of Harper v. Commissioner, T.C. Memo. 2002-121.  In the context of a family limited partnership the bona fide sale exception is satisfied where the record establishes the existence of a legitimate and significant nontax reason for creation of the family limited partnership and the transferors received partnership interests proportionate to the value of the property transferred.  Estate of Bongard v. Commissioner, supra at 118 (citing Estate of Stone v. Commissioner, T.C. Memo. 2003-309, and Estate of Harrison v. Commissioner, T.C. Memo. 1987-8).  The objective evidence must establish that the nontax reason was a significant factor that motivated the partnership's creation.

---

[20]An arm's-length transaction is not limited to a transaction between unrelated parties.  See Estate of Bongard v. Commissioner, 124 T.C. 95, 122-123 (2005).  However, where the parties are related we subject the transaction to a higher level of scrutiny, and we analyze whether the terms and conditions of the transaction were the same as if the transaction had been between unrelated parties.  See id. at 123.

See id.; Estate of Harper v. Commissioner, supra; Estate of Harrison v. Commissioner, supra. "A significant purpose must be an actual motivation, not a theoretical justification." Estate of Bongard v. Commissioner, supra at 118.

We analyze the bona fide sale exception under two prongs: (1) Whether the transaction qualifies as a bona fide sale; and (2) whether the decedent received adequate and full consideration. Id. at 119; see also Estate of Jorgensen v. Commissioner, T.C. Memo. 2009-66, affd. 107 AFTR 2d 2011-2069, 2011-1 USTC par. 60,619 (9th Cir. 2011).

### 1. Whether the Transaction Was a Bona Fide Sale

Whether a sale is bona fide is a question of motive. We must determine whether the record supports a finding that Clyde Sr. had a legitimate and significant nontax reason for forming Turner & Co. Petitioner argues that Clyde Sr. had several nontax reasons for creating Turner & Co. Respondent argues that tax savings were the primary motivation for the transfer.

The Turner & Co. partnership agreement lists three general reasons and nine specific reasons for the formation of the partnership. However, the reasons listed in the partnership agreement were taken from a form partnership agreement and do not necessarily reflect Clyde Sr. and Jewell's actual reasons for

establishing Turner & Co.[21]  In any event, we do not simply rely on a list of reasons.  See Estate of Hurford v. Commissioner, T.C. Memo. 2008-278.  Instead, we examine the evidence to see whether any of the asserted nontax reasons was a significant factor in creating the partnership.  See id.

Petitioner argues that Clyde Sr. and Jewell created Turner & Co. for at least one of the following legitimate and significant nontax reasons:

> (1) To consolidate their assets for management purposes and allow someone other than themselves or their children to maintain and manage the family's assets for future growth pursuant to more active and formal investment management strategy; (2) to facilitate resolution of family disputes through equal sharing of information; and (3) to protect the family assets and Jewell from Rory, and protect Rory from himself.

The objective facts in the record fail to establish that any of these reasons was a legitimate and significant reason for formation of Turner & Co.

### a.    Asset Consolidation and Centralized Management Pursuant to a Formal Strategy

Consolidated asset management may be a legitimate and significant nontax purpose.  Estate of Schutt v. Commissioner, T.C. Memo. 2005-126; see also Estate of Black v. Commissioner,

---

[21]For example, the partnership agreement states that one of the purposes of Turner & Co. was to consolidate or eliminate fractional interests in realty and other family assets.  In fact, Clyde Sr. and Jewell did not contribute any real property to Turner & Co., and all of the contributed property was easily divisible.

133 T.C. 340, 371 (2009).  However, consolidated asset management generally is not a significant nontax purpose where a family limited partnership is "just a vehicle for changing the form of the investment in the assets, a mere asset container."  Estate of Erickson v. Commissioner, T.C. Memo. 2007-107; see also Estate of Schutt v. Commissioner, supra ("the mere holding of an untraded portfolio of marketable securities weighs negatively in the assessment of potential nontax benefits available as a result of a transfer to a family entity" (citing Estate of Thompson v. Commissioner, 382 F.3d 367, 380 (3d Cir. 2004))); Estate of Harper v. Commissioner, supra ("Without any change whatsoever in the underlying pool of assets or prospect for profit * * * there exists nothing but a circuitous 'recycling' of value.").

Most of the cases in which we have held that consolidated asset management is a legitimate nontax purpose have involved assets requiring active management or special protection.  Estate of Black v. Commissioner, supra at 371 (large bloc of voting stock in closely held corporation); Estate of Mirowski v. Commissioner, T.C. Memo. 2008-74 (patent royalties and related investments); Estate of Stone v. Commissioner, supra (closely held business); see also Kimbell v. United States, 371 F.3d 257 (5th Cir. 2004) (working oil and gas interests).

In Estate of Schutt v. Commissioner, supra, we held that the formation of a family limited partnership to perpetuate the

decedent's buy-and-hold investment philosophy was a legitimate and significant nontax purpose even where active management was not intended, where the record established that the decedent's primary concern was perpetuating his investment philosophy and the family limited partnership allowed him to achieve his objective. Similarly, in Estate of Black v. Commissioner, supra at 371, we held that consolidating a family's interest in a closely held corporation was a significant nontax purpose, where creation of the family limited partnership allowed the stock, which represented a potential swing vote, to be voted as a bloc; protected the stock from creditors; and prevented family members from disposing of the stock imprudently. On the other hand, in Estate of Erickson v. Commissioner, supra, we held that centralizing management of family assets and giving management responsibility to the decedent's daughter were not legitimate and significant nontax purposes, where the transferred property consisted mainly of passive assets, the daughter already had significant management responsibilities with respect to the assets, and creation of the family limited partnership did not afford greater creditor protection or further any other nontax purpose. See also Estate of Thompson v. Commissioner, supra at 378-380; Estate of Harper v. Commissioner, T.C. Memo. 2002-121.

Unlike the decedent in Estate of Black v. Commissioner, supra, neither Clyde Sr. individually nor his family collectively

owned a significant amount of stock in an operating business that Clyde Sr. or Jewell contributed to the partnership.[22] Clyde Sr. and Jewell owned passive investments rather than a business requiring active management. Petitioner does not dispute that Clyde Sr. and Jewell contributed only passive assets to Turner & Co. More specifically, Clyde Sr. and Jewell contributed the following assets to Turner & Co. with value totaling approximately $8,667,342 (or $4,333,671 each): Cash, 152,406 shares of Regions Bank stock, 100 shares of NBOG Bancorporation stock, 100 shares of Friends Bank stock, 250 shares of Southern Heritage Bancorp stock, 21 certificates of deposit at Habersham Bank, a certificate of deposit at Regions Bank, five certificates of deposit at United Community Bank, and assets held in four investment accounts. Clyde Sr.'s and Jewell's contributions from the mentioned four investment accounts consisted of 2,100 shares of Regions Bank stock, preferred stock of four companies (of which two were power companies), bonds, and three variable annuities.[23] In short, the contributed assets consisted of marketable securities (bank stocks and energy stocks, mostly preferred stock), fixed income investments (bonds and annuities),

---

[22]Although Clyde Sr. and Jewell contributed more than 150,000 shares of Regions Bank stock to Turner & Co., the transferred shares represented less than one-tenth of 1 percent of Regions Bank's total outstanding shares.

[23]Around the time of the transfer the value of the annuities totaled $407,375.

cash, and certificates of deposit.  Unlike the partnership assets involved in <u>Estate of Mirowski v. Commissioner</u>, <u>supra</u>, and <u>Estate of Stone v. Commissioner</u>, T.C. Memo. 2003-309, the Turner & Co. assets required no active management or special protection. Moreover, unlike the decedents in those cases, Clyde Sr. did not have a unique or distinct investment philosophy that he hoped to perpetuate.  On the contrary, according to petitioner, Clyde Sr.'s lack of a coherent investment plan was one of the primary reasons for the formation of Turner & Co.

Petitioner points to Turner & Co.'s real estate activity to suggest that Clyde Sr. and Jewell contributed passive assets to provide Marc and Travis with the ability to start an active and profitable real estate development business.  Petitioner contends that such a real estate business was a crucial component of a more aggressive investment strategy.  Yet the objective evidence in the record suggests that the handful of real estate deals were of the same kind and with the same individuals as Clyde Sr.'s real estate activity before the formation of Turner & Co.  In other words, Turner & Co.'s real estate activity was the same type of  activity as that which Clyde Sr. engaged in before forming Turner & Co.  This record does not support a finding that Marc and Travis started a real estate development business by investing in these real estate deals.  Rather, the record

supports a more limited finding that, if real estate deals came Clyde Sr.'s way, they were channeled through Turner & Co.

In reaching our conclusion that asset management was not a significant nontax purpose, we rely on our finding that Turner & Co.'s portfolio of marketable securities did not change in a meaningful way. Regents Bank stock continued to dominate the portfolio from the time of the partnership formation until Clyde Sr.'s death. Whatever assets Turner & Co. added to the portfolio had a risk/return profile similar to the profile of the assets Clyde Sr. and Jewell contributed to the partnership. For example, the account statements for Turner & Co.'s Wachovia Securities account reflect only four purchases up to the date of Clyde Sr.'s death: GMAC Notes, Morgan Stanley preferred stock, Ford Motor preferred stock, and Suburban Propane Partners common stock. The account statements of Turner & Co.'s Morgan Keegan accounts also show only a few purchases. According to those statements, Turner & Co. purchased Ford Motor Credit preferred stock (three purchases), GMAC Notes, GMAC Smart Notes, and General Electric notes. With the exception of common stock of Suburban Propane Partners, Turner & Co. therefore generally added to its portfolio fixed-income investments. Turner & Co. therefore continued to hold a portfolio consisting of common stock of mostly bank companies, preferred stock, bonds, cash, and cash equivalents, similar to what Clyde Sr. and Jewell held

individually.  As a consequence, handing management over the assets to Marc and Turner had no material impact on the profit potential of the portfolio.

Petitioner points to the fact that Turner & Co. opened and closed certificates of deposit at various banks to support petitioner's claim of active investing.  Yet certificates of deposit are akin to cash equivalents, and renewing certificates of deposit can hardly be considered pursuing a diversified strategy.  The objective facts in the record do not support petitioner's argument that Turner & Co. was formed to consolidate Clyde Sr. and Jewell's assets and allow for centralized management pursuant to a formal investment strategy or to pursue a more aggressive investment strategy.

Petitioner's argument regarding more efficient management also fails in the light of the fact that Marc already had significant responsibilities with respect to his grandparents' finances before Turner & Co. was formed, and it is not clear what nontax advantages the family limited partnership offered.  See Estate of Erickson v. Commissioner, T.C. Memo. 2007-107.  Any genuine concern Clyde Sr. or Jewell had regarding the scattered state of their investments or the lack of a formal investment strategy could have been readily addressed without transferring the assets to a family limited partnership.  Finally, Turner & Co. did not meaningfully consolidate Clyde Sr. and Jewell's

assets or implement an active and formal investment management strategy.

### b. Resolution of Family Discord

Petitioner argues that Turner & Co. also was formed to resolve disputes among Turner family members through equal sharing of information. Although resolution of family disputes or promotion of family harmony may be a legitimate and significant nontax purpose for creation of a family limited partnership, see Estate of Mirowski v. Commissioner, T.C. Memo. 2008-74; see also Estate of Stone v. Commissioner, supra,[24] petitioner's argument is not credible under the circumstances.

_____

[24]Petitioner attempts to analogize the Turner family to the family in Estate of Stone v. Commissioner, T.C. Memo. 2003-309, in which we held that transfers of assets into five family limited partnerships were bona fide sales for adequate and full consideration, where the partnerships were created in part to resolve a dispute among the decedent's adult children. However, Estate of Stone is distinguishable in several respects.

In Estate of Stone the decedent's adult children were involved in bitter litigation that threatened the family's closely held business, the litigation centered on the children's respective shares of their parents' assets, which required active management, and the family limited partnerships actually resolved the family dispute by identifying the child who would manage each asset both during their parents' lives and after their parents' deaths. By contrast, the rancor among the Turner children had not resulted in litigation, or even the threat of litigation; did not threaten a family business; and did not involve assets requiring active management. Moreover, unlike the adult children in Estate of Stone, there is no evidence that the Turner children took any particular interest in their parents' assets or were concerned about how their parents managed their investments. On the contrary, Betty testified that she did not inquire, and did not believe it was her business to inquire, about her parents' finances.

The ill will among the Turner children was not about money, per se, and there is no evidence that the Turner children ever expressed a particular interest in managing their parents' assets. Instead, the bad feelings among the Turner children stemmed from the fact that Clyde Jr. had a domineering personality and had an unpleasant attitude toward his sisters and their husbands. Moreover, Clyde Jr.'s and his sons' involvement in Mt. Yonah caused Betty and Janna to resent their brother and to believe that their parents were treating them unfairly.

Given the source of the Turner family tension, we are not convinced that Clyde Sr.'s and Jewell's transfer of most of their wealth to a partnership managed by Clyde Jr.'s sons was intended to resolve family discord. Indeed, when Betty and Janna learned that Marc and Travis were managing Turner & Co., they demanded changes to the partnership agreement, including removal of Marc and Travis as the successor general partners. Petitioner's argument appears to be little more than an after-the-fact, hypothetical justification for the creation of Turner & Co.

### c. Protection of Jewell From Rory and Rory From Himself

Finally, petitioner argues that Turner & Co. was formed to protect Jewell from Rory and Rory from himself. Although asset protection may be a legitimate and significant nontax reason for formation of a family limited partnership, see, e.g., Schurtz v. Commissioner, T.C. Memo. 2010-21 (formation of a family limited

partnership to protect a family business from Mississippi's litigious atmosphere was a legitimate and significant nontax purpose), petitioner's argument that Turner & Co. was formed to provide asset protection is not credible.

When Turner & Co. was formed, Jewell was in her late seventies but was in good health physically and mentally.  She had a close relationship with Rory, and she gave him money from time to time.  Whatever concerns she, Clyde Sr., or other Turner family members had regarding Rory's drug problems, there is no evidence that Jewell's gifts to Rory were anything but voluntary, nor is there any credible evidence in the record that Jewell wanted or needed protection from Rory.  In the absence of such evidence, we can perceive no reason Jewell needed to be protected from spending her own money however she saw fit.

Moreover, Turner & Co. did not, in fact, protect Jewell from Rory because Clyde Sr. and Jewell retained more than $2 million outside the partnership and Jewell still had access to money she could give to Rory.  Petitioner argues that Turner & Co. created the appearance of protection because after formation of the partnership Jewell could tell Rory that she did not have money to give him and Rory would accept that.  If Rory could be so easily misled, Clyde Sr. and Jewell did not have to go through the trouble of creating a limited partnership, transferring most of

their assets to the partnership, and incurring legal, accounting, and other fees.

Finally, petitioner's argument that Turner & Co. protected Rory from himself lacks merit. Before the creation of Turner & Co. and the gifts of limited partnership interests, Rory had no assets to protect; all of the assets at issue belonged to Clyde Sr. and Jewell. Moreover, Rory's Trust adequately protected any assets that Clyde Sr. and Jewell wished to transfer to Rory, either during their lives or upon their deaths. Petitioner failed to explain how placing the assets in a limited partnership, as opposed to transferring the underlying assets to Rory's Trust, provided any meaningful additional protection. Accordingly, we conclude that the transfers fail the bona fide sale prong of the bona fide sale exception.

2.    Factors Indicating the Transfers Were Not Bona Fide Sales

Several additional factors indicate that the transfers to Turner & Co. were not bona fide sales. First, Clyde Sr. stood on both sides of the transaction, and he created Turner & Co. without any meaningful bargaining or negotiation with Jewell or with any of the other anticipated limited partners; i.e., his children and grandchildren. See Estate of Harper v. Commissioner, T.C. Memo. 2002-121. Second, Clyde Sr. commingled personal and partnership funds when he used partnership funds to make personal gifts to Marc and Travis, to pay premiums on life

insurance policies for the benefit of his children and grandchildren, and to pay legal fees relating to his and Jewell's estate planning.  Third, Clyde Sr. and Jewell did not complete the transfer of assets to Turner & Co. for at least 8 months after formation of the partnership.[25]  See Estate of Hurford v. Commissioner, T.C. Memo. 2008-278; Estate of Bigelow v. Commissioner, T.C. Memo. 2005-65, affd. 503 F.3d 955 (9th Cir. 2007); Estate of Harper v. Commissioner, supra.

      3.    Whether Clyde Sr. Received Partnership Interests in Turner & Co. That Were Proportionate to the Value of the Property Transferred

The parties stipulated that the partnership interests Clyde Sr. received were proportionate to the fair market values of the assets he contributed to Turner & Co. and that the assets Clyde Sr. contributed to Turner & Co. were properly credited to his capital accounts.  Consequently, we conclude that Clyde Sr. satisfied the full and adequate consideration prong of the bona fide sale exception.

      4.   The Bona Fide Sale Exception Does Not Apply

On the basis of the foregoing, we conclude that the formation of Turner & Co. falls short of meeting the bona fide

---

[25]Petitioner argues that it took longer than expected for Clyde Sr. and Jewell to transfer their assets to Turner & Co. because of poor recordkeeping on their part.  However, at the time Turner & Co. was formed Marc had been assisting Clyde Sr. and Jewell with their recordkeeping for approximately 8 years (since 1994 according to Marc's testimony).  Thus, any delays in transferring assets to Turner & Co. cannot be blamed on Clyde Sr.'s and Jewell's poor recordkeeping.

sale exception.  Rather, Clyde Sr. changed the form in which he held the interest in the contributed assets, and the formation of Turner & Co. was a part of a testamentary plan.  Accordingly, the bona fide sale exception of section 2036(a) does not apply to Clyde Sr.'s transfer of property to Turner & Co.  We therefore consider whether Clyde Sr. retained for his life the possession or enjoyment of the transferred property.

C.    Possession or Enjoyment of Transferred Property

Property is included in a decedent's gross estate if the decedent retained, by express or implied agreement, possession, enjoyment, or the right to income from the transferred property. Sec. 2036(a)(1); Estate of Erickson v. Commissioner, T.C. Memo. 2007-107.  For purposes of section 2036(a), a transferor retains the enjoyment of property if there is an express or implied agreement at the time of the transfer that the transferor will retain the present economic benefits of the property, even if the agreement is not legally enforceable.  Estate of Reichardt v. Commissioner, 114 T.C. 144, 151 (2000); Estate of Erickson v. Commissioner, supra.  In deciding whether there was an implied agreement, we consider all facts and circumstances surrounding the transfer and subsequent use of the property.  See Estate of Reichardt v. Commissioner, supra at 151.

Factors indicating that a decedent retained an interest in transferred assets under section 2036(a)(1) include a transfer of

most of the decedent's assets, continued use of transferred property, commingling of personal and partnership assets, disproportionate distributions to the transferor, use of entity funds for personal expenses, and testamentary characteristics of the arrangement. Estate of Gore v. Commissioner, T.C. Memo. 2007-169; Estate of Erickson v. Commissioner, supra (citing Estate of Rosen v. Commissioner, T.C. Memo. 2006-115, and Estate of Harper v. Commissioner, supra). The taxpayer bears the burden, which is especially onerous in transactions involving family members, of proving that an implied agreement did not exist. Estate of Reichardt v. Commissioner, supra at 151-152.

We turn to the record and examine it for what it shows about Clyde Sr.'s possession and enjoyment of the assets he transferred to Turner & Co. We start with the partnership agreement. The partnership agreement expressly provides that the general partner is entitled to a "reasonable" management fee, and Clyde Sr. and/or Jewell chose to receive a management fee of $2,000 per month without any apparent regard for the nature and scope of their actual management duties. There is nothing in the record to suggest that a $2,000 management fee was reasonable. The record does not disclose what, if anything, Clyde Sr. and Jewell did to manage the partnership. In fact, some of the evidence suggests that Clyde Sr. and Jewell did not manage the partnership at all. The so-called management fee was paid under

circumstances suggesting that no management services were actually provided. This is not indicative of a business or investment activity conducted for profit. Rather, it resembles an investment account from which withdrawals could be made at will. This impression is reenforced by a provision in the partnership agreement that gave Clyde Sr. the right, as general partner, to amend the partnership agreement at any time without the consent of the limited partners.

We turn now to an examination of the factors that tend to show an agreement to retain possession and enjoyment of the transferred assets. Nearly all of the facts point to an implied agreement. Clyde Sr. transferred most of his assets to Turner & Co. Nearly 60 percent of the value of all property that Clyde Sr. and Jewell contributed to Turner & Co. consisted of Regions Bank common stock. Because of his and Jewell's sentimental attachment to the Regions Bank stock, Turner & Co. did not sell the Regions Bank stock. Although he and Jewell retained sufficient assets outside of the partnership to meet their living expenses, they opted to receive management fees from Turner & Co. for few or no management services and took distributions from Turner & Co. at will. As discussed above, Clyde Sr. used Turner & Co. funds to make personal gifts to Marc and Travis, to pay life insurance premiums on policies held by Clyde Sr.'s Trust for the benefit of his children and grandchildren, and to pay legal

fees related to his estate planning.  He also commingled personal and partnership funds when he personally paid Turner & Co.'s debt to Habersham Bank, purchased the Lake Hartwell property on behalf of Turner & Co., and reimbursed Turner & Co. for its purchase of GMAC Notes.[26]  Clyde Sr. also received disproportionate distributions from Turner & Co.[27]

Most importantly, contrary to petitioner's assertions, we find that the purpose of Turner & Co. was primarily testamentary. When Clyde Sr. purportedly approached Marc about creating a vehicle to consolidate his assets, he allegedly stated that he and Jewell were not getting any younger.  Petitioner's own witnesses testified that when Clyde Sr. met with attorneys at Stewart, Melvin & Frost, he said that he wanted to discuss estate planning.  Many of the specific purposes Clyde Sr. purportedly outlined at the meeting were testamentary, e.g., providing for Jewell after his death, providing income for future generations, and protecting his children and grandchildren from creditors.  We are particularly struck by the implausibility of petitioner's assertion that tax savings resulting from the family limited

---

[26]Clyde Sr.'s willingness to pay more than $500,000 on behalf of Turner & Co. without any documentation whatsoever strongly indicates, at best, a disregard for partnership formalities and, at worst, a failure to distinguish personal from partnership funds.

[27]Ms. Walden-Crowe testified that all payments to Clyde Sr. or Jewell were intended for both since, as husband and wife, they could make unlimited gifts to one another.

partnership were never discussed during a meeting focusing in part on estate planning. We do not find testimony to that effect to be credible, and that lack of credibility infects all of the testimony petitioner offered about what Clyde Sr. allegedly said or intended about the purpose of the family limited partnership. In our finding we rely partially on Mr. Coyle's letter to Clyde Sr. in which he wrote: "A key element to a gifting plan is the need of a sound appraisal of the partnership for tax purposes." And indeed such appraisal was the key to Clyde Sr.'s estate plan: both the gift tax and estate tax returns used substantial discounts despite the fact that the partnership assets at each relevant date consisted of, inter alia, cash, cash equivalents, and marketable securities. In summary, we conclude that the formation of Turner & Co. had testamentary characteristics and Clyde Sr. did not curtail his enjoyment of the transferred assets after formation of the partnership.

D.   Section 2036(a)(2)

We now turn to section 2036(a)(2). Property is included in a decedent's gross estate under section 2036(a)(2) if the transferor retained "the right, either alone or in conjunction with any person, to designate the persons who shall possess or enjoy the property or the income therefrom." However, a transferor's retention of the right to manage transferred assets does not necessarily require inclusion under section 2036(a)(2).

See United States v. Byrum, 408 U.S. 125, 132-134 (1972); Estate of Schutt v. Commissioner, T.C. Memo. 2005-126.

Clyde Sr. was, for all intents and purposes, the sole general partner of Turner & Co.,[28] and the partnership agreement gave him broad authority not only to manage partnership property, but also to amend the partnership agreement at any time without the consent of the limited partners.  As a general partner, Clyde Sr. had the sole and absolute discretion to make pro rata distributions of partnership income (in addition to distributions to pay Federal and State tax liabilities) and to make distributions in kind.  Moreover, Clyde Sr. had the authority to amend the partnership agreement at any time without the consent of the limited partners.  Finally, even after the gifts of limited partnership interests to their children and grandchildren, Clyde Sr. and Jewell owned more than 50 percent of the limited partnership interests in Turner & Co. and could make any decision requiring a majority vote of the limited partners.

E.    Summary

In summary, we conclude that Clyde Sr. made an inter vivos transfer of property to Turner & Co., the transfer was not a bona fide sale for adequate and full consideration because it was not

---

[28]Even if we were to treat Jewell as a coequal general partner of Turner & Co. we would reach the same conclusion because sec. 2036(a)(2) applies where the transferor's right to designate who shall possess or enjoy property and the income therefrom is held "alone or in conjunction with any person".

motivated by a legitimate and significant nontax purpose, and Clyde Sr. retained by both express and implied agreement the right to possess and enjoy the transferred property, as well as the right to designate which person or persons would enjoy the transferred property. Consequently, section 2036 includes the values of transferred property in Clyde Sr.'s gross estate.[29]

III. Additional Taxable Gifts

Section 2501 imposes a tax on the transfer of property by gift by an individual. The tax imposed by section 2501 applies whether the transfer is in trust or otherwise, whether the gift is direct or indirect, and whether the property is real or personal, tangible or intangible. Sec. 2511.

The tax imposed by section 2001 is equal to the excess of the tentative tax on the sum of the amount of a decedent's taxable estate and the amount of adjusted taxable gifts, over the amount of tax that would have been payable as a gift tax with respect to gifts made by a decedent after December 31, 1976. Sec. 2001(b). The term "adjusted taxable gifts" means the total amount of taxable gifts (within the meaning of section 2503) made by the decedent after December 31, 1976, other than gifts which

---

[29]Because we conclude that the assets Clyde Sr. transferred to Turner & Co. are included in his gross estate under sec. 2036(a)(1) and (2), we need not consider respondent's alternative argument that the assets are included under secs. 2038 and/or 2035.

are includable in the gross estate of the decedent.  Id.; Estate
of Cristofani v. Commissioner, 97 T.C. 74, 78 (1991).

Section 2503(a) defines "taxable gifts" as the total amount
of gifts made during the calendar year, less applicable
deductions.  Section 2503(b) provides that in computing gifts for
the taxable year, the donor may exclude the first $10,000 of
gifts,[30] other than gifts of future interests in property, made to
any person during the calendar year (the annual exclusion).

Section 25.2503-3(b), Gift Tax Regs., defines a present
interest as "An unrestricted right to the immediate use,
possession, or enjoyment of property or the income from property
(such as a life estate or term certain)".  A transfer does not
qualify as a gift of a present interest in property if the
beneficiary's enjoyment of the gift is subject to the discretion
of a third party.  Sec. 25.2503-3(c), Example (1), Gift Tax Regs.
No part of the value of the gift of a future interest qualifies
for the annual exclusion.  Sec. 25.2503-3(a), Gift Tax Regs.  For
purposes of the annual exclusion, the term "future interest"
includes "reversions, remainders, and other interests or estates,
whether vested or contingent, and whether or not supported by a
particular interest or estate, which are limited to commence in
use, possession, or enjoyment at some future date or time."  Id.

---

[30]The annual exclusion amount is subject to a cost-of-living
adjustment.  See sec. 2503(b)(2).

In distinguishing present interests from future interests
for Federal gift tax purposes, the test is not whether the
beneficiary was likely to receive the present enjoyment of the
property, but whether he or she had the legal right to demand it.
As we explained in Estate of Cristofani v. Commissioner, supra at
83 (citing Crummey v. Commissioner, 397 F.2d 82, 88 (9th Cir.
1968), affg. in part and revg. in part T.C. Memo. 1966-144)):

> the likelihood that the beneficiary will actually
> receive present enjoyment of the property is not the
> test for determining whether a present interest was
> received. Rather, we must examine the ability of the
> beneficiaries, in a legal sense, to exercise their
> right to withdraw trust corpus, and the trustee's right
> to legally resist a beneficiary's demand for payment.
> * * *

In Crummey v. Commissioner, supra at 82-83, the taxpayers
established an irrevocable trust for the benefit of their
children, some of whom were minors. The trust agreement provided
that following a gift of property to the trust by the taxpayers
or any other person, each beneficiary had the right to demand
cash from the trust. Id. at 83. The trust agreement also
provided that if a beneficiary were a minor, that beneficiary's
guardian was authorized to make that a demand on behalf of the
child. Id. The U.S. Court of Appeals for the Ninth Circuit
acknowledged that it was extremely unlikely that any of the minor
beneficiaries would make such a demand. Id. at 87. Indeed, the
Court of Appeals noted that some, if not all, of the
beneficiaries did not even know they had the right to demand

money from the trust.  Id. at 88.  Nevertheless, the Court of Appeals held that where the trustee could not legally resist the demand, the gift was a gift of a present interest and the property was subject to the annual exclusion under section 2503(b).

The parties agree that Clyde Sr. made indirect gifts to the beneficiaries of Clyde Sr.'s Trust when he paid the premiums on life insurance policies for the benefit of his children and grandchildren.  The parties disagree, however, on the nature of the gifts.  Petitioner contends that the gifts were gifts of present interests (and therefore subject to the annual exclusion) because the beneficiaries had the absolute right and power to demand withdrawals of amounts transferred to Clyde Sr.'s Trust.  Respondent contends that the gifts were gifts of future interests (and therefore not subject to the annual exclusion).  Specifically, respondent argues the beneficiaries' withdrawal rights were illusory because Clyde Sr. did not deposit money with the trustees of Clyde Sr.'s Trust but instead paid the life insurance premiums directly and because the beneficiaries did not receive notice of the transfers.  Consequently, respondent argues that the beneficiaries had no meaningful opportunity to exercise the right of withdrawal.

The terms of Clyde Sr.'s Trust gave each of the beneficiaries the absolute right and power to demand withdrawals

from the trust after each direct or indirect transfer to the trust. The fact that Clyde Sr. did not transfer money directly to Clyde Sr.'s Trust is therefore irrelevant. Likewise, the fact that some or even all of the beneficiaries may not have known they had the right to demand withdrawals from the trust does not affect their legal right to do so. See Crummey v. Commissioner, supra at 86-87; Estate of Cristofani v. Commissioner, supra at 80. We therefore conclude that the premium payments Clyde Sr. made as indirect gifts to Clyde Sr.'s Trust in 2000-2003 were gifts of present interests and are subject to the annual exclusion.

Respondent argues, in the alternative, that even if we conclude the premium payments were gifts of present interests, some of the gifts made in 2002 and 2003--specifically, the gifts made to Clyde Jr., Betty, Janna, Trey, and Rory--are still includable in Clyde Sr.'s taxable estate. This is so, respondent argues, because the transfers of limited partnership interests to Clyde Jr., Betty, Janna, Trey, and Rory in 2002 and 2003 used up their annual exclusions and any additional gifts to those beneficiaries during 2002 and 2003 are includable in Clyde Sr.'s estate. We disagree.

For the reasons discussed above, we have concluded that the value of property Clyde Sr. transferred to Turner & Co. is included in his gross estate under section 2036. Consequently,

the gifts of limited partnership interests that the estate reported on Forms 706 and 709 must be disregarded for purposes of calculating Clyde Sr.'s adjusted taxable gifts. To do otherwise would result in the double inclusion of a significant part of the property transferred to Turner & Co. in Clyde Sr.'s estate.[31]

IV. Conclusion

In summary, we hold that the value of the property Clyde Sr. transferred to Turner & Co. is included in his gross estate under section 2036(a). Because section 2036 includes in a decedent's gross estate the fair market value of the transferred property, i.e., the underlying assets Clyde Sr. transferred to Turner & Co., no discount for lack of control or lack of marketability is appropriate. Instead, the parties should look to the fair market value of the assets Clyde Sr. contributed to Turner & Co. as of the date of Clyde Sr.'s death in determining the amount that is included in his gross estate.

We further hold that the premium payments Clyde Sr. made in 2000-2003 for life insurance policies held by Clyde Sr.'s Trust were gifts of present interests in property to the trust beneficiaries. By reason of the above, respondent must disregard the purported gifts of limited partnership interests in Turner &

---

[31]Respondent appears to recognize this principle: in the notice of deficiency, respondent increased Clyde Sr.'s taxable estate by the net asset value of the property transferred to Turner & Co. but made a corresponding reduction to the adjusted taxable gifts.

Co. in calculating Clyde Sr.'s adjusted taxable gifts in order to prevent double inclusion of the value of the property transferred to Turner & Co. for transfer tax purposes.

We have considered the remaining arguments of both parties for results contrary to those expressed herein and, to the extent not discussed above, find those arguments to be irrelevant, moot, or without merit.

To reflect the foregoing,

Decision will be entered under

Rule 155.