T.C. Memo. 2020-40

UNITED STATES TAX COURT

ESTATE OF HOWARD V. MOORE, DECEASED, VIRGIL L. MOORE,
EXECUTOR AND TRUSTEE, Petitioner v. COMMISSIONER OF INTERNAL
REVENUE, Respondent

HOWARD V. MOORE, DONOR, a.k.a. ESTATE OF HOWARD V. MOORE,
DECEASED, VIRGIL L. MOORE, EXECUTOR AND TRUSTEE, Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket Nos. 21209-09, 22082-09.[1]       Filed April 7, 2020.

Gregory A. Robinson, for petitioner.

Derek W. Kaczmarek, Brandon A. Keim, Doreen Marie Susi, and Michael
R. Harrel, for respondent.

_____

[1] We consolidated the cases at docket nos. 21209-09 and 22082-09 for trial,
briefing, and opinion.

[*2]  MEMORANDUM FINDINGS OF FACT AND OPINION

HOLMES, Judge:  Howard Moore was born into rural poverty but over a long life built a thriving and very lucrative farm in Arizona.  In September 2004 he began negotiating its sale, but his health went bad.  He was released from the hospital and entered hospice care by the end of that year.

Then he began to plan his estate.

What his lawyer came up with was quite complex--a combination of five trusts and a partnership--and it required him to contribute most of his farm to the partnership.  His stated reason was to protect the farm from various business risks and bring his sometimes fractious family together to learn to manage the business without him.  But five days after the partnership received part ownership of the farm, Moore sold it.  And even after the sale, Moore stayed on the farm and directed its operations until he died.

The key question we have to answer is whether Moore's plan works to reduce the size of his taxable estate.  We also have to figure out whether Moore's efforts to reduce the size of his taxable estate resulted in taxable gifts.

**[\*3]**                                    FINDINGS OF FACT

I.      <u>The Moore Family</u>

Howard Moore was born in 1916 in Coffee, Texas.  He had a particularly difficult upbringing.  When Moore was young, his father suffered a mental breakdown and lost the family farm and home.  The family stayed together but moved to Arizona and lived on the banks of the Colorado River in a home thatched out of arrowweed, not that different from the precolonial homes of the local Native Americans.

This was an unpromising start in life, made more difficult by an education that stopped with the eighth grade.  But Moore had learned to work and found a job in the Dome Valley near Yuma, Arizona.  There he became a land leveler,[2] in a local economy where there was so little cash money that land levelers sometimes got paid with the land they leveled.  This was the beginning of the Moore family farm.  He began to acquire more land of his own in the riverbed of the Gila River.  And though that river was for a long time dried out on the surface, water still ran beneath the soil.  By pumping water from the soil, Moore was able to irrigate his

---

[2]  A land leveler is one who literally levels people's properties.  The process is an important one:  Leveling the ground makes it easier to irrigate it and helps conserve water by reducing runoff.

**[*4]** fields.  He slowly assembled more than 1,000 acres[3]--and consolidated his many parcels into what became Moore Farms.

In the following years Moore started a family.  Moore and his first wife had four children--Virgil, Ronnie, Milton, and Lynda.  But Moore separated from her in the early 1970s and began a long battle with alcoholism.  Milton credibly testified that it was nearly a decade before his dad finally went to a rehab facility in Washington State for help.  Even aside from this problem, his relationship with his children was complicated.  During trial his children described him as "strong", "manipulative", "firm", and "tough", particularly on his sons.  Milton shared an evocative childhood memory with the Court:  He'd just come home from a schoolyard fight with a classmate.  Seemingly indifferent to the boy's injuries, Moore asked Milton to show him his hands.  Seeing they were unblemished, he warned Milton that the next time he got in a fight, he "[didn't] want to see no skin on them knuckles."

Moore often played his sons against each other to motivate them.  This bred conflict, and in 1987, a final dispute:  Milton borrowed Ronnie's tractor to pull his

---

[3] Moore Farms originally spanned over 1,000 acres.  Moore's acreage decreased to 845 after he conveyed a portion of his land to Doval Farms, a joint enterprise with one of his sons and that son's wife.  Moore was a 49% shareholder in Doval.

**[\*5]** farming equipment. When Ronnie found out, he became "very angry," pulled out his semiautomatic rifle, and emptied a clip into the tractor. The bullets caused thousands of dollars in damage to the tractor's radiator but even more damage to the Moore family. Milton fled out of concern for his wife and unborn child. He would not return for many years.

II.    The Estate Planning

As Moore entered extreme old age, he began to think about selling the farm, and by 2004 became more focused. Ronnie successfully negotiated the terms of a sale of Doval Farms--the portion of land Moore had partly conveyed to him and his wife--before, as we will see, giving it away to a family partnership for sale with Moore Farms. Moore Farms itself had long attracted the interest of agribusiness outfits, but Moore didn't want his lifelong venture to fall into the hands of corporate agriculture. One of his neighbors, Mellon Farms, was large but still a family operation, well known and well respected. Moore was interested, and negotiations began.

Then a crisis struck. In December 2004, before Moore could finish a deal with the Mellons, he was rushed to the emergency room with congestive heart failure. He then suffered a heart attack, developed heat stroke, and was unable to breathe on his own. Despite his doctors' noting his condition as critical, he

[*6] insisted that he wanted to return home. A hospice doctor gave him less than six months to live and certified him for in-home hospice care. Once he was home, an initial assessment by another hospice provider described Moore as anxious but alert, though he did need help with various everyday tasks like bathing and walking. Moore was aware of his condition and his prognosis, and told his caretaker that one of his hopes was that he would have time to complete an estate plan. The hospice's initial assessment and other records do show that, throughout his entire time in hospice, Moore's priority was making sure his affairs were in order.

Even under the care of hospice, Moore would not stay in bed, and with the help of his grandson--who would be out in the field every day to report back--Moore stayed in charge of all final decisions about Moore Farms. By the end of December 2004, though, he was ready to make an estate plan.

Moore called Bradley Hahn, an attorney who's specialized in estate planning for almost 15 years. Hahn's previous work on Mrs. Moore's estate plan before her passing made Moore familiar with his work. Hahn testified to the nature of the call: Moore believed that his release from the hospital was "an extension of his life," and he wanted to meet with Hahn to try to "save the millions of dollars of taxes" to protect his family. So Hahn entered what he calls a

**[*7]** "design phase" whereby he compiled a list of the client's goals for his estate plan.

From Moore's own description of his estate-planning goals we find that he was focused primarily on maintaining *control* and eliminating his estate tax.  His written goals were as follows:

- I would like to maintain my customary lifestyle.  This should include about $150,000 annually after all taxes and gifts.  I would also like flexibility built into my plan so that amount can be adjusted to meet future circumstances.

- It is also important to me that the plan allow adequate liquidity for emergencies and investment opportunities.  I prefer to keep at least $500,000 in cash readily available and another $500,000 in marketable securities that can be liquidated within 30 days, if necessary.

- I wish to maintain control of my assets during my lifetime.

- There should be cash flow in the plan to allow me to make annual gifts to my children.

- I wish to treat my children equally upon my death.  Virgil should receive his residence, Ronnie should receive one half of my interest in RRCH Moore Custom Farming and all of my interest in Yuma Speedway, LLC.

- I would like to manage and preserve the value of my assets, as well as protect my assets from potential creditors and judgments.

- I would like to reduce income taxes, if possible.

[*8]
- It is of importance that the plan reduce or eliminate federal estate taxes, if possible.

- I would like for my grandson, Chet, to immediately have farming equipment so that he can continue farming, if he desires. Additionally, upon my death, Chet shall receive one half of my interest in RRCH Moore Custom Farming.

- Upon the sale of the land, I would like my children and my grandson, Chet, to each receive $500,000.

By the end of the year, Moore set up a partnership, a charitable foundation and a series of trusts to achieve these goals. He created all of the following entities with Hahn's help, on December 20, 2004--just four days after being discharged from the hospital:

- Howard V. Moore Living Trust (Living Trust),

- Howard V. Moore Charitable Lead Annuity Trust (Charitable Trust),

- Howard V. Moore Children's Trust (Children's Trust),

- Howard V. Moore Family Management Trust (Management Trust),

- Howard V. Moore Irrevocable Trust No. 1 (Irrevocable Trust), and

- Howard V. Moore Family Limited Partnership (FLP).

**[*9]**   A.   <u>Howard V. Moore Living Trust</u>

Living trusts, unlike wills, come into effect during the creator's life.  Ralph M. Engel, "The Pros and Cons of Living Trusts as Compared to Wills," 29 Est. Plan. 155, 155 (2002).  Because they are revocable, they are frequently used by tax planners in instances where the client wishes to retain control of his assets during his lifetime.  <u>Id.</u>  Moore transferred all his real and intangible personal property to the Living Trust--and this included Moore Farms.  The Living Trust's initial trustees were Moore, Virgil, and Lynda.  Moore retained complete power over any asset held in the Living Trust during his life.  The trust documents provided that Moore had the express and total power to control and direct payments, add or remove trust property, and amend or revoke the trust.  Upon his death, the Living Trust provided that after payment of Moore's expenses, claims, taxes, and specific distributions of personal property and real estate, the remaining trust property should be divided between two trusts: the Charitable Trust and the Children's Trust.

B.   <u>Howard V. Moore Charitable Lead Annuity Trust</u>

The Charitable Trust was not set up to distribute money to charities directly. It would instead make distributions to the Howard V. Moore Foundation (Moore Foundation), which would then contribute money to the Community Foundation

**[*10]** for Southern Arizona.[4]  Once the donation reached the Community

Foundation, the money was to be split among several charities.  Decisions

regarding the final destination of the funds are a joint effort of the boards of the

Moore Foundation and the Community Foundation.  Those boards meet about

once a year.  The Charitable Trust had by the time of trial donated a total of $2.5

million.

And the amount that the Living Trust would distribute to the Charitable

Trust was defined a little bit oddly--not as a fixed sum or a fixed amount or a fixed

value of property, but as a fraction of the full value of the estate:

The numerator is calculated as:

[T]he smallest amount which, when transferred to the Howard V.
Moore Charitable Lead Annuity Trust as provided in Section 2 of the
Article will result in the least possible federal estate tax being payable
as a result of my death after allowing for the applicable exclusion
amount (after taking into account adjusted taxable gifts, if any) as
finally determined for federal estate tax purposes, and the credit for

---

[4]  We are certain this foundation exists--it's listed on checks, but there is
very little about it in the record.  We think it more likely than not to have been set
up to facilitate all the other transactions we'll describe, but not to have played a
significant role in their characterization under the Code.  Moore chose the
Community Foundation for Southern Arizona because of that foundation's ability
to serve multiple local charities.  The Community Foundation is a public charity
under section 501(c)(3).  Unless otherwise indicated, all section references are to
the Internal Revenue Code in effect for the years at issue and all Rule references
are to the Tax Court Rules of Practice and Procedure.

[*11] state death taxes (but only to the extent that the use of this credit does not require an increase in the state death taxes paid).

The denominator is the value of the Living Trust as determined for federal estate-tax purposes.

During trial Hahn testified that the purpose of the Charitable Trust was to provide a vehicle through which Moore's children would be kept on speaking terms. Their work with the Charitable Trust would force them to meet periodically and make decisions about what charities would best promote the values of the family. Moore hoped this process would also force the siblings to work together. The meetings, however, are informal and attendance is not mandatory.

C.     Howard V. Moore Children's Trust

The remainder of the Living Trust's property was to be distributed to the Children's Trust. The Children's Trust provided for the distribution of the remaining trust property to each beneficiary--Virgil, Ronnie, Milton, and Lynda--in equal shares to be held in trust. The Children's Trust also directed specific distributions of the Living Trust's property: Ronnie was to receive a 50% interest in the general partnership RRCH Moore Custom Farming as well as 100% of the interest in the Yuma Speedway, LLC. Virgil was to receive Moore's home and some surrounding land.

**[*12]** D.    Howard V. Moore Family Management Trust

The Management Trust was an irrevocable trust set up by Moore.  The Management Trust's only purpose was to be a partner in the Family Limited Partnership, which we discuss in detail below, and its only asset was a 1% general interest in the FLP.  The initial trustees of the Management Trust were Virgil and Lynda, and its designated beneficiary was Moore.  The trust documents specified that upon Moore's death any of the Management Trust's remaining assets would be transferred to each of his four children by operation of the Living Trust.

E.    The Howard V. Moore Irrevocable Trust No. 1

The Irrevocable Trust was initially funded with only $10.  Virgil was appointed its trustee and Moore's children were its beneficiaries.  During Moore's lifetime the trustee of the Irrevocable Trust was to make distributions to the beneficiaries according to their needs, and distributions did not have to be in equal shares.  Moore did not give himself a reversionary interest or other similar interest in the Irrevocable Trust, so he seemingly had no control over it.  But upon his death, the trustee was instructed to "distribute an amount equal to the value of any asset of this trust which is includible in my gross estate for federal estate tax purposes" to the Living Trust to be distributed in accordance with its terms.  The estate and the Commissioner agree that the only way this clause becomes operative

**[*13]** is by some examination by the Commissioner that results in the inclusion of additional property in the gross estate.

In the years following Moore's death, the Irrevocable Trust's trustee transferred large sums of money to the Charitable Trust. Each donation had the same origins. First, the Irrevocable Trust received a transfer of a certain sum from the FLP. That sum was used to fund the Charitable Trust, which then made a payment to the Foundation. From 2007-09 the Charitable Trust made three payments to the Foundation: $790,000 in 2007, $433,818 in 2008, and $433,818 in 2009.

F.     Howard V. Moore Family Limited Partnership

After describing all these trusts, we come to the keystone of this estate plan--the Howard V. Moore Family Limited Partnership. Family limited partnerships are another tool used by planners. They allow taxpayers--often but not always taxpayers who own an operating business--to transfer property to family members by moving it into a partnership and then making other family members into partners. The original owner usually makes himself general partner and can still maintain effective control. James F. Hopson, "Safeguarding the Family Limited Partnership," 121 J. Tax'n 213, 213 (2014). The IRS often views

[*14] these partnerships as efforts to pass valuable assets to one's heirs at a discount for lack of marketability and lack of control.

Like the Living Trust, the FLP was set up by Moore's attorney on December 20, 2004.  The Management Trust, the Living Trust, Virgil, Ronnie, Milton, and Lynda made a total initial contribution of $10,000:

| Partner | Type of interest | Contribution | Interest (%) |
| --- | --- | --- | --- |
| Management Trust | General | $100 | 1 |
| Living Trust | Limited | 9,500 | 95 |
| Virgil | Limited | 100 | 1 |
| Ronnie | Limited | 100 | 1 |
| Milton | Limited | 100 | 1 |
| Lynda | Limited | 100 | 1 |

To make things more complicated, Ronnie contributed his interest in Doval Farms to the FLP.  And even this was done in a roundabout way.  First, he and Moore deeded their interests in Doval Farms to the Living Trust on February 4, 2005. The Living Trust then contributed Doval Farms to the FLP along with four-fifths of Moore Farms.  This was meant to avoid treating Ronnie and his wife as having contributed Doval Farms to the FLP, and they seemingly made the contribution to

[*15] the Living Trust for no compensation.[5]  According to Hahn, the family considered Doval Farms to be Moore's property.  Moore deeded a majority share of it to Ronnie only to get around some vaguely defined state-law issue.[6]

During trial Moore's sons maintained that the purpose of the FLP was to protect against liabilities, creditors, and bad marriages.  Ronnie claimed that much of that risk was from the use of pesticides.  For example, DDT, long since outlawed, was once used regularly in the Yuma area.  Ronnie claimed that farmers typically incur liability from the improper use of other pesticides.  He made no mention during trial, however, about whether Moore Farms itself had ever used any of these banned pesticides.  Ronnie also claimed that chemical spills in the Colorado River posed a liability due to the health risks they caused to farm workers.  None of Moore's children, though, knew of any creditors or potential creditors who might pose a risk to their property, or even threaten them with lawsuits.

Ronnie also testified during trial that because the family was--as he put it--"dysfunctional," the FLP was supposed to bring the family together.  But if so, the

---

[5]  This may look like another gift-tax issue, but the Commissioner did not address it and it is not relevant to these cases.

[6]  The record has few details, but we suspect that there existed some state tax law or regulation giving favorable treatment to farms smaller than Moore's.

[*16] FLP flopped. It doesn't seem as if there has ever been a second meeting of the partners. An investment adviser handles all investment decisions according to a set of "investment objectives." And neither Ronnie nor his siblings have vetoed any of the adviser's decisions.

The FLP agreement contained a number of restrictions, the effect of which meant that unless the family unanimously agreed, no single partner could transfer or sell any interest. The FLP agreement also contained the following restrictions on a general partner:

Section 1. Restrictions on Transfer

Except as provided in this Article, a General Partner is prohibited from selling, transferring, encumbering or otherwise disposing of any General Partnership Interest without the unanimous consent of all the Partners.

A transfer of a General Partnership Interest or the admission of a substitute General Partner in violation of the provisions of this Article shall be completely null and void.

Article 12 contains similarly restrictive clauses on the FLP's limited partners:

Section 1. Restrictions on Transfer

Except as provided in the Article, a Limited Partner is prohibited from selling, assigning, transferring, encumbering or otherwise disposing of any interest in the Partnership without the written consent of the General Partner and all of the Limited Partners.

**[\*17]** The Partners are under no obligation to give such consent, nor are they subject to liability for withholding their consent.

The FLP agreement also restricted a partner's ability to name an assignee of his interest without written consent from all general and limited partners. Limited partners had no right to participate in business management or operations. The purpose of these many restrictions--as stated in the FLP agreement--was not "intended as a penalty, but as a method to protect and preserve existing relationships based upon trust and to protect the Partnership's capital and its financial ability to continue to operate."

Each of Moore's children joined the FLP and accepted all these restrictions without seeking any legal advice. They did not negotiate the terms of the partnership agreement or their partnership percentage. Each credibly testified that he didn't have his own reasons for joining the FLP, but did it simply because Moore asked them too. Their understanding of the FLP was also quite limited-- they knew its purpose was only to benefit the family in some way.

So, to recap: Moore created a total of five trusts and one limited partnership in one day. His only unfinished business was the sale of Moore Farms--something he'd meant to do before his placement with hospice.

[*18] III.    Moore's Last Months of Life

In the last months of his life Moore finally finished negotiating the sale of Moore Farms, which had been stymied by his sudden decline in health. We specifically find that Moore knew he would sell Moore Farms even before he contributed it to the FLP. He had begun negotiating the sale in earnest back in September; and it was under contract with the Mellons for $16,512,000 within five days after Moore contributed it to the Living Trust, which then contributed four-fifths of it to the FLP. On February 4, 2005, Moore closed on the sale, and the money was transferred. Though the FLP held four-fifths of the interest in Moore Farms, the decision to sell was not a family one. We specifically find that Moore decided on his own to sell Moore Farms.

Even after the sale Moore continued to live on the property. This is not unusual when a long-held family farm is sold: According to credible testimony, it's common practice for the new owner to let the original owner continue to live on his homestead. An arrangement like this can even last the remainder of the seller's life. What took this out of the ordinary, though, was that the deal not only let Moore live out his days in his own house but let him operate the farm as well. And he did so--he managed the property and continued farming on it until the day he died.

[*19] After the deal was signed, though, the Mellons' money began flowing into the Living Trust and FLP. That gave Moore one last list of chores that he wanted to get done.

A.    Attorney's Fees

Moore first paid the promissory note for the attorney's fees he owed to Hahn for setting up all these entities. Though Moore thought the fees were high, he ultimately accepted Hahn's "standard rate"--though at the price of a lecture that Hahn had better do an excellent job. Hahn's total fee for the design was $320,000, and Moore paid $100,000 of that fee upfront. After the sale, Moore paid the remaining $220,000. Or, to be more precise, he directed the payment, because 80% came from the FLP's share of the proceeds and only 20% came out of the Living Trust.

B.    Gifts to the Children

It was then time for Moore to check off another item on his list. Moore had the FLP issue a check for $500,000 to each of his four children. But not for nothing, or so it seemed--because Moore required each child to sign a promissory note for the money. The notes all said the same thing: Each child promised to pay the $500,000 back to the FLP on or before February 2010. Interest on the notes

[*20] accrued at a rate of 3.6% per annum beginning on the date the notes were issued. They did not specify a payment schedule.

Other than a piece of paper calling the payments loans, there was very little indication that's what they were. None of Moore's children made payments of principal or interest. The FLP has not made any effort to collect. And we found the children credible when they said that Hahn specifically advised them that they need not make payments on the loans. Moore's grandson Chet also got a $500,000 check, but was the only one to receive a "gift" of $500,000 for tax purposes.

C.    Transfer of Funds From the FLP to the Living Trust

The third chore on the list was to have the FLP pay $2 million to the Living Trust. This money was eventually used for three things:

- About $104,000 was used to cover expenses of the land sale.

- About $40,000 was used for "difference of mtgs; gain and cash rec."[7]

- The rest covered Moore's income-tax bill on the sale of Moore Farms.

---

[7] We do not know what this means, but it's what the March 2005 note receivable from the Living Trust says.

**[*21]** Though Lynda testified that she thought the payment of the funds was a loan, there is no record of that, and there is no record of the Living Trust's ever repaying the FLP.[8]

### D.    Confusing the Entities

There was one last chore--moving the FLP's cash to an account.  This happened on February 25, 2005, when the FLP opened an account with the WM Group of Funds with an initial investment of $1.8 million.  But while the investment slip lists the FLP as the account owner, the money actually came from the Living Trust, and the Living Trust was also the customer actually named on the account.  We find that this means that the FLP was using the Living Trust's funds to invest.

At about that same time the Living Trust sent $500,000 to the Irrevocable Trust.  Moore reported this as a gift on his 2005 gift-tax return ($125,000 to each of his children).

A couple weeks later, on March 7, 2005, the Living Trust transferred its entire interest in the FLP to the Irrevocable Trust for $500,000 cash and a note for $4.8 million.  The note set an interest rate of 4.5% per annum with a principal due

---

[8]  The return reported the "loan" as the estate's liability and the FLP's receivable.

[*22] date in March 2010.  The parties stipulated that the cash downpayment of

$500,000 was made with the "gift" to the Irrevocable Trust in the previous month.

Virgil signed the sale agreement as trustee for the Irrevocable Trust and as trustee

for the Living Trust (along with Moore himself and Lynda).  Lynda credibly

testified that she was not aware of any negotiations over the price of the FLP

interest, nor did she understand how the price was set.[9]  Nothing in the record

suggests that the Irrevocable Trust has ever made any interest or principal

payments on the note.

IV.    Moore's Death

Moore died at the end of March 2005.  He was 89 years old.  After his

death, the Living Trust covered many of his final expenses.[10]  These included

another fee to Hahn--a flat $475,000 for the administration of the estate in addition

to his fees for designing the estate plan.  Nothing in the record explains what

"administrative" work Hahn did for the estate, but he claims to have continued his

work "to this date."  The Estate reported this expense not on its Form 706, United

---

[9]  The purchase price of the FLP limited interest was based on an $11.5 million net asset value of the FLP minus a 53% discount.  This resulted in a purchase price of about $5.3 million.

[10]  The Living Trust agreement provides broad discretionary authority to the trustees to pay any "[e]xpenses with regard to the administration of [the] estate."

[*23] States Estate (and Generation-Skipping Transfer) Tax Return, Schedule L, Net Losses During Administration and Expenses Incurred in Administering Property Not Subject to Claims, but on Schedule J, Funeral Expenses and Expenses Incurred in Administering Property Subject to Claims.

In all, Moore's estate-tax return reported:

- $53,875 for the Management Trust's 1% general interest in the FLP;

- $4.8 million for a note receivable from the Irrevocable Trust;

- $2 million for a debt owed to the FLP;

- $4.8 million for a charitable contribution to the Charitable Trust;

- $1.5 million in taxable gifts; and

- $475,000 for administrative attorney's fees.

The estate also filed a Form 709, United States Gift (and Generation-Skipping Transfer) Tax Return, for the 2005 tax year. This return reported a $500,000 gift to Chet, and gifts of $125,000 for each of Moore's children in the form of the $500,000 transfer to the Irrevocable Trust earlier that year.

[*24] V.    Notices of Deficiency

Something in all this caught the Commissioner's attention, and he issued a notice of deficiency to the estate determining a deficiency of nearly $6.4 million. We summarize their points of disagreement:

| Item | Return as filed | As determined |
|---|---|---|
| Gift tax on gifts within 3 years of death | -0- | $1,329,751 |
| FLP; general interest | $53,875 | -0- |
| Note receivable from Irrevocable Trust | 4,833,480 | -0- |
| Property transferred to FLP | -0- | 7,552,595 |
| Legal fees on Schedule J | 475,000 | -0- |
| Debt payable to FLP | 2,021,882 | -0- |
| Transfer to Charitable Trust | 4,745,671 | 516,000 |

Also in June 2009 the Commissioner issued a notice of deficiency determining a gift tax liability of more than $1.3 million for the 2005 tax year.

| [*25]  Description | As filed | As determined |
|---|---|---|
| Cash gifts to Virgil | $125,000 | $625,000 |
| Cash gifts to Ronnie | 125,000 | 625,000 |
| Cash gifts to Milton | 125,000 | 625,000 |
| Cash gifts to Lynda | 125,000 | 625,000 |
| Deemed gift upon sale of a 99% interest in FLP to Irrevocable Trust (this is an alternative to the Commissioner's primary position in the estate-tax case) | -0- | 940,253 |
| Total | 500,000 | 3,440,253 |
| Increase to Schedule A | -0- | 2,940,253 |

We must decide several issues:

- First we deal with the estate. We have to decide whether the value of the farm must be included in Moore's estate under section 2036 despite its sale in large part through the FLP.

- Next, if some of the value of the farm is included in the estate, we need to decide whether the subsequent transfer of the Living Trust's interest in the FLP to the Irrevocable Trust removed that value.

- We also have to decide whether Moore's estate can deduct a $2 million debt payable to the FLP, *future* charitable contribution deductions, and $475,000 in attorney's fees.

- Last, we must decide whether Moore's transfers of $500,000 to each of his children were gifts or loans.

[*26] We consolidated the cases and tried them in Phoenix. Moore was an Arizona resident when he died; Virgil, who serves as executor and trustee, was also an Arizona resident when the petitions were filed.[11]

OPINION

The Code imposes a tax on the taxable estate of a decedent. Sec. 2001(a). The taxable estate is the value of a decedent's gross estate minus applicable deductions. Sec. 2051. A decedent's gross estate includes the value of any property that a decedent had an interest in at the time of his death. Sec. 2033. Sections 2034 through 2045 tell us what other property to include in an estate. Some taxpayers reduce their estate-tax liability by making *inter vivos* transfers several years before their death[12] and pay a usually smaller tax on the transfer.[13] Sec. 2501(a).

---

[11] Appeals would therefore presumably go to the Ninth Circuit. See sec. 7482(b)(1)(A).

[12] To reduce his estate-tax liability, a decedent must give property away more than three years before his death. If he doesn't, any tax paid on the gift must be added to his estate. Sec. 2035(b).

[13] Usually, but not always. Federal gift-and-estate-tax law allows a credit that reduces the tax on gifts made while the donor is alive; and if it's not used up, it can reduce the estate tax. Sec. 2505(a).

[*27] The estate asserts that because the proper forms were adhered to in creating all the entities, we should respect them as what the estate contends they are. The Commissioner asserts that much more property (or its value) should have been included in Moore's estate, and that Moore's gift-tax return should have reported several more gifts. He views Moore's estate plan as nothing more than a last-minute, last-ditch effort to avoid paying tax.

He argues more specifically that the major part of the estate plan fails under section 2036 because the transfer of four-fifths of the farm to the FLP was not a *bona fide* sale for full and adequate consideration inasmuch as Moore didn't have legitimate nontax reasons for forming the FLP, and because he kept possession and enjoyment of Moore Farms even after its sale.

And if that doesn't work, he has a backup section 2036 argument along the same line; namely, that the sale of the Living Trust's interest in the FLP to the Irrevocable Trust was also not *bona fide* and for full and adequate consideration and that Moore kept using the Living Trust's FLP interest until his death. This would add back the value of the FLP interest to the estate.

The Commissioner next argues that the estate is not entitled to a charitable deduction for any additional amounts transferred to the Charitable Trust after Moore's death because they were contingent on the IRS's examination of the

[*28] estate's return. He even asserts that the estate shouldn't get a deduction for Hahn's $475,000 in attorney's fees because they were not incurred in the administration of Moore's estate, and even if they were, they were unreasonably high.

Finally, the Commissioner argues that because no legitimate credit-debtor relationship existed between Moore and his children, the $500,000 cash payments to them were gifts. And, because the cash payments were gifts made during the three-year period preceding Moore's death, his gross estate includes the amount of gift tax paid.

A.    Section 2036

Section 2036(a) is a catchall designed to prevent taxpayers from avoiding estate tax simply by transferring all their assets out of their estates before they die. Strangi v. Commissioner, 417 F.3d 468, 476 (5th Cir. 2005), aff'g T.C. Memo. 2003-145. Section 2036(a) recaptures the value of certain assets transferred by a decedent *inter vivos* where the decedent has retained benefits or rights to benefits. Estate of Bigelow v. Commissioner, 503 F.3d 955, 963 (9th Cir. 2007), aff'g T.C. Memo. 2005-65; Strangi, 417 F.3d at 476; Estate of Thompson v. Commissioner, 382 F.3d 367, 375 (3d Cir. 2004), aff'g T.C. Memo. 2002-246, 84 T.C.M. (CCH) 374 (2002).

**[*29]** We begin with the language of the section itself, and highlight the phrases in play here:

> SEC. 2036(a). General Rule.--The value of the gross estate shall include the value of all property to the extent of any interest therein of which the decedent has at any time made a transfer (*except in case of a bona fide sale for an adequate and full consideration* in money or money's worth), by trust or otherwise, under which he has retained for his life or for any period not ascertainable without reference to his death or *for any period which does not in fact end before his death*
>
> (1) *the possession or enjoyment of, or the right to the income from, the property * * * .*

Over the years we've developed a three-part test that determines whether section 2036 will pull property back into a decedent's estate. Estate of Bongard v. Commissioner, 124 T.C. 95, 112 (2005). We will not respect a transfer if:

> (1) the decedent made an inter vivos transfer of property; (2) the decedent's transfer was not a bona fide sale for adequate and full consideration; <u>and</u> (3) the decedent retained an interest or right * * * in the transferred property * * * [<u>Id.</u>; fn. ref. omitted.]

Another way of looking at this--and another way we frequently discuss it--is to look at section 2036(a) as creating a general rule that brings back all the property that a decedent transfers before he dies, subject to two exceptions. Kimbell v. United States, 371 F.3d 257, 261 (5th Cir. 2004). The first is for property where an estate can show the sale was a *bona fide* sale for adequate and

[*30] full consideration.  Estate of Bongard, 124 T.C. at 118; Estate of Hurford v.

Commissioner, T.C. Memo. 2008-278, 96 T.C.M. (CCH) 422, 439 (2008).  The

second is for any property that the decedent transferred in which he did not keep a

right to possession, enjoyment, or rights to the issue of the transferred property.

Kimbell, 371 F.3d at 261.

　　　We'll take them in order.

　　　1.　　Was the Transfer of Moore's Interest in Moore Farms From His
　　　　　　Living Trust to the FLP a *Bona Fide* Sale for Adequate and Full
　　　　　　Consideration?

　　　Whether a transfer was for adequate and full consideration is a question of

value.  Estate of Bongard, 124 T.C. at 117-18.  Whether a transfer of property was

*bona fide* turns on motive.[14]  Id.

---

[14]  Since Estate of Bongard, many of our cases look only to whether there was a significant nontax purpose for a transfer--though some use the term "arm's length" without deciding whether the transaction was genuinely at arm's length. See generally Estate of Black v. Commissioner, 133 T.C. 340 (2009); Estate of Turner v. Commissioner, T.C. Memo. 2011-209, 102 T.C.M. (CCH) 214 (2011), supplemented by 138 T.C. 306 (2012); Estate of Shurtz v. Commissioner, T.C. Memo. 2010-21, 99 T.C.M. (CCH) 1096 (2010).  Some cases do use both analyses, as we did in Estate of Bongard.  See generally Estate of Holliday, T.C. Memo. 2016-51, 111 T.C.M. (CCH) 1235 (2016); Estate of Hurford, T.C. Memo. 2008-278, 96 T.C.M. (CCH) 422 (2008).  And in Estate of Trombetta v. Commissioner, T.C. Memo. 2013-234, 106 T.C.M. (CCH) 416 (2013), we employed only an arm's-length analysis in examining a transfer of assets to an annuity trust and not a family limited partnership.

[*31] We have long held that the *bona fide* sale exception is limited to a transfer of property where the transferor "has received benefit in full consideration in a genuine arm's length transaction." Estate of Miller v. Commissioner, T.C. Memo. 2009-119, 97 T.C.M. (CCH) 1602, 1608 (2009) (quoting Estate of Goetchius v. Commissioner, 17 T.C. 495, 503 (1951)). But we have also held that, at least in the context of a family limited partnership, a sale is *bona fide* only if the record establishes the existence of a legitimate and significant nontax reason for creation of the family limited partnership and the transfer of assets to it. Estate of Bongard, 124 T.C. at 118. "The objective evidence must establish that the nontax reason was a significant factor that motivated the partnership's creation." Estate of Turner v. Commissioner, T.C. Memo. 2011-209, 102 T.C.M. (CCH) 214, 223 (2011), supplemented by 138 T.C. 306 (2012). We'll first look at motive. In Estate of Mirowski v. Commissioner, T.C. Memo. 2008-74, 95 T.C.M. (CCH) 1277, 1286 (2008), we found the business in question was at all times a valid and functioning investment operation. The decedent's family in that case had active and complicated roles managing patents, patents-license agreements, and ongoing litigation. Id. In Estate of Stone v. Commissioner, T.C. Memo. 2012-48, 103 T.C.M. (CCH) 1237, 1240 (2012), we found that even though the decedent transferred property with testamentary purposes in mind, that was not his only

[*32] purpose--family members would still have to develop and sell the land under their control. The desire to consolidate marketable assets and manage them as a family asset for continuing investment purposes is also a genuine nontax motive under section 2036. Estate of Purdue v. Commissioner, T.C. Memo. 2015-249, 110 T.C.M. (CCH) 627, 631 (2015). There, the decedent's children met at least once a year to discuss the family's accounts and assets in great detail. Id. at 629.

The estate asserts that Moore's principal reason for forming the FLP and transferring his interest in Moore Farms to it was to bring his family together so that they could learn how to manage the business without him. The estate relies on Estate of Mirowski for its contention that "a desire by a decedent to have assets jointly managed by family members, even standing alone, is a sufficient nontax motive for purposes of section 2036(a)." Estate of Stone, 103 T.C.M. (CCH) at 1240 (citing Estate of Mirowski, T.C. Memo. 2008-74).

But the transfers that we've found were motivated by genuine nontax purposes were of businesses that required active management. See Estate of Bigelow, 503 F.3d at 972. In these cases, there was no business to run. Moore sold Moore Farms just five days after he transferred four-fifths of it to the FLP. What's more, we find that he knew a month before the sale closed that he would sell it. This means as a practical matter that there was no farm for Moore's

[*33] children to manage together. The only assets left in the FLP for Moore's children to manage were liquid, and they didn't even actually manage them. Other than the FLP's startup meeting, the children have never met to make and review investment decisions. They have an investment adviser who handles that for them, and there simply is no business to run. See Strangi, 417 F.3d at 481-82 (rejecting "active management" argument where assets were never actively managed); Estate of Erickson v. Commissioner, T.C. Memo. 2007-107, 93 T.C.M. (CCH) 1175, 1181 (2007) ("We find that the [entity] was a mere collection of mostly passive assets intended to assist [the decedent's] tax planning and benefit the family.").

Moore's sons maintained at trial that the FLP would also function as protection from creditors. While protection from creditors can be considered a legitimate--though not significant--nontax reason to form an FLP, see Estate of Mirowski, 95 T.C.M. (CCH) at 1281, there is no credible evidence that Moore or any of his children had a legitimate concern with possible creditor claims. Moore's children were unable to name any possible creditors and were unaware of any threats of possible litigation.[15] See Liljestrand v. Commissioner, T.C. Memo. 2011-259, 102 T.C.M. (CCH) 440, 446-47 (2011) (disbelieving claimed motive

---

[15] Trial testimony also pointed to a small concern regarding "bad marriages." There is nothing in the record, however, to suggest any of Moore's children either have had or were having marital problems.

[*34] where the estate failed to name even a single creditor).  Besides, the FLP held a significant amount of capital for any creditor to pull from--providing very little protection for the children's own assets.  See Estate of Erickson, 93 T.C.M. (CCH) at 1181 (rejecting the estate's claim that the partnership affords creditor protection where it held significant asset base).  We, therefore, find that Moore's estate had no nontax reasons for forming the FLP.

Several other factors also support a finding that the transfer was not *bona fide*.  Moore had significant health problems.  Aware that death was imminent, he reached out to Hahn and told him he wanted to "save the millions of dollars of taxes."  Four days after being discharged from the hospital--four days after being in "critical condition" and placed in the care of hospice--Moore had created a complex and extensive "estate plan."  This strongly supports a finding that the FLP was not formed for significant nontax reasons, but instead was part of an attempt to avoid federal gift and estate taxes.  See Estate of Miller v. Commissioner, 97 T.C.M. (CCH) at 1610 ("The record indicates that the driving force behind the * * * transfers was the precipitous decline in decedent's health in the weeks before the transfers"); Estate of Rector v. Commissioner, T.C. Memo. 2007-367, 94 T.C.M. (CCH) 567, 573-74 (2007) (considering "decedent's age and health at the time of [entity] formation" in concluding that formation of entity was

**[*35]** not for significant nontax reasons); <u>Estate of Erickson</u>, 93 T.C.M. at 1182

("[A]ge and declining health weigh against a finding that the parties formed the

[entity] for any reason other than to help reduce [the decedent's] estate tax

liability."); <u>Estate of Rosen v. Commissioner</u>, T.C. Memo. 2006-115, 91 T.C.M.

(CCH) 1220, 1234 (2006) ("The fact that decedent was 88 years old and in failing

health strongly supports our finding that the transfer of the assets was purely for

the purpose of avoiding Federal estate and gift taxes.").

We also can't ignore the testamentary essence of the whole plan. This was

very far from a deal, even a deal within a family: There was no bargaining, no

negotiating, not even any questioning. Instead, Moore unilaterally set up the FLP.

He alone created the restrictions in the FLP agreement. None of Moore's children

sought legal advice on the terms or so much as negotiated their percentage of

shares. Moore's children each joined the FLP because Moore told them to--they

did not have their own reasons. Moore's unilateral decision making tends to

contradict any assertion of a *bona fide* sale. <u>See, e.g.</u>, <u>Estate of Rosen</u>, 91 T.C.M.

(CCH) at 1232.

**[*36]** We conclude that Moore did not have significant nontax reasons for the formation of the FLP, and thus, the transfer of most of his interest in Moore Farms to the FLP was not a *bona fide* sale for adequate and full consideration.[16]

> 2. Did Moore Retain Possession or Enjoyment of Moore Farms After He Transferred It to the FLP?

We next discuss, as an alternate holding, whether Moore retained "possession or enjoyment" of his transferred interest. A decedent retains "possession or enjoyment" of property if he retains a "substantial present economic benefit" from the property. Strangi, 417 F.3d at 476 (quoting United States v. Byrum, 408 U.S. 125, 145 (1972)). There must be either an "express or implied" agreement "at the time of the transfer" that the decedent will retain possession or enjoyment of the property. Sec. 20.2036-1(c)(1), Estate Tax Regs. It's not even necessary that the decedent's right be legally enforceable--"The existence of formal legal structures which prevent de jure retention of benefits of the transferred property does not preclude an implicit retention of such benefits." Estate of Bongard, 124 T.C. at 129 (quoting Estate of Thompson, 382 F.3d at 375).

_____

[16] This means that we need not address the issue of value; i.e., whether Moore's transfer was for adequate and full consideration. Even if we found that Moore received full value, he would still need a nontax reason for the transfer. See, e.g., Strangi, 417 F.3d at 478-82.

[*37] We find that Moore had, at the very least, an implied agreement to retain possession or enjoyment of the farm property upon the transfer of four-fifths of Moore Farms to the FLP and even after the sale of the entire farm to the Mellons. After the transfer to the FLP (and even after the sale of Moore Farms to the Mellons), Moore continued to live on the property and continued to operate Moore Farms as his own--he made all the decisions. We've held time and time again that a decedent's continued occupancy of property after its transfer to an entity is evidence of an implied agreement. Strangi, 417 F.3d at 477; Estate of Trombetta v. Commissioner, T.C. Memo. 2013-234, 106 T.C.M. (CCH) 416, 424 (2013); Estate of Trotter v. Commissioner, T.C. Memo. 2001-250, 82 T.C.M. (CCH) 633, 636 (2001).

Even after the sale of Moore Farms to the Mellon family, we have to find that there was an implied agreement that let Moore retain possession or enjoyment of the entire farm and not just the one-fifth of his interest in the farm that Hahn's plan carefully kept in the Living Trust. The estate relies entirely on Estate of Kelly v. Commissioner, T.C. Memo. 2012-73, 103 T.C.M. (CCH) 1393 (2012), to argue that the reservation of that large a fraction is proof that Moore did not keep a prohibited interest in the remainder. In Estate of Kelly, we did find it significant

[*38] that the decedent observed the family partnership formalities by keeping sufficient assets for his personal needs in his estate.  Id. at 1397.

That argument wouldn't work here:  Moore treated not just the farm but even the portion of the sale proceeds that was stored in the FLP as his own. Though he kept sufficient assets for his personal needs, Moore didn't use them. Instead, he scooped into FLP assets to pay personal expenses.  See, e.g., Estate of Hurford v. Commissioner, 96 T.C.M. (CCH) at 445 (finding that the taxpayer retained an interest in the transferred assets because she impermissibly took distributions for her living expenses directly from the entity).  Moore used FLP assets to make the $2 million distribution to his Living Trust, in part to cover certain personal expenses; and he also used FLP assets to give $500,000 to each of his children, and pay part of his attorney's fees for the estate plan.  His using FLP assets instead of his own to pay these personal expenses leads us to find an implied agreement that Moore could enjoy their lifetime possession and use just as much as the farm.  See, e.g., Strangi, 417 F.3d at 477; see also Estate of Korby v. Commissioner, 471 F.3d 848, 853 (8th Cir. 2006); Estate of Rosen, 91 T.C.M. (CCH) at 1235.

Moore's relationship to his assets remained unchanged before and after the transfer.  See Estate of Hurford, 96 T.C.M. (CCH) at 445.  He kept control over

[*39] FLP assets.  Even though he did not personally hold the controlling general interest in the FLP--Virgil and Lynda were the trustees of the Management Trust that purportedly controlled the FLP--Moore's children typically did things because Moore asked them to, and giving them nominal "power" was no different from Moore's keeping that power.  His continuing control is especially apparent in his unilateral decision to sell Moore Farms to the Mellon brothers despite four-fifths of it being a FLP asset.  He even highlighted in his estate goals the importance of maintaining control over his assets.  We, therefore, find that there was an implicit understanding between Moore and his children that he would continue to use his assets as he desired and that his relationship with them changed formally, not practically.  Cf. Estate of Thompson, 382 F.3d at 373; see also Estate of Rosen, 91 T.C.M. (CCH) at 1235-36 (given decedent's old age and poor health, it was implied that decedent's children would not prevent her from continuing to use her transferred assets).  We find that Moore retained "possession or enjoyment" of his assets within the meaning of section 2036(a)(1).

In sum, because Moore retained possession or enjoyment of the farm, and because his transfer of part ownership to the FLP lacked a substantial nontax

[*40] purpose, the value of Moore Farms should be included in the value of the estate under section 2036(a)(1).[17]

> 3.  What To Do About Section 2043(a)?

Until recently, our analysis of the estate's situation could end here. Our finding that the transfer of most of the farm to the FLP didn't change its inclusion in Moore's gross estate would just mean that the proceeds from the farm's sale to the Mellons would be included in Moore's gross estate, and that the value of the interest in the FLP attributable to the contribution would be excluded. See, e.g., Estate of Thompson, 84 T.C.M. (CCH) at 391. Excluding the value of the partnership interest from Moore's gross estate might appear to be the right result because it would prevent its inclusion in the value of the estate twice. The problem is that there is nothing in the text of section 2036 that allows us to do this. Nothing in section 2036 allows us to *exclude* anything from the estate, only to *include* the value of the transferred property.

But then we decided Estate of Powell v. Commissioner, 148 T.C. 392 (2017). We discovered and analyzed there, apparently for the first time, section

---

[17] We, therefore, need not address the Commissioner's alternative arguments that Moore's estate plan triggered their inclusion under section 2036(a)(2); or that the subsequent transfer of the Living Trust's assets to the Irrevocable Trust also triggers their inclusion under section 2036.

**[*41]** 2043(a) of the Code as it applies to family limited partnerships. In Estate of Powell v. Commissioner, 148 T.C. at 404, the taxpayer had transferred assets with a value of $10 million to a limited partnership in exchange for a 99% interest in the partnership as a limited partner. We held that section 2036 compelled inclusion of this $10 million in the gross estate. We also carefully observed, however, that section 2033 seemed to compel inclusion of the partnership interest in the estate. That's where section 2043(a) does its work--it let us subtract the value of the partnership interest that the estate held. Id. at 408-09.

The facts made it easy to apply section 2043 in Estate of Powell. They don't here.

### a. The Problem of Section 2043(a)

The root of this problem is that section 2043 prohibits the Commissioner from just adding the proceeds from the sale of Moore's farm to his gross estate. It requires instead a more complicated set of calculations when there are transactions--like the transfer of four-fifths of the farm from the Living Trust to the FLP--that fall within section 2036. Section 2043(a) says (with the key word italicized)

> If any one of the transfers * * * described in sections 2035 to 2038, inclusive, and section 2041 is made, created, exercised, or relinquished for a consideration in money or money's worth, but is

**[*42]** not a bona fide sale for an adequate and full consideration in money or money's worth, there shall be included in the gross estate *only* the excess of the fair market value at the time of death of the property otherwise to be included on account of such transaction, over the value of the consideration received therefor by the decedent.

The number that needs to be included in the gross estate can be expressed in an equation: $V_{included} = C_d + FMV_d - C_t$, where

$V_{included}$ = value that must be added to the gross estate;

$C_d$ = date-of-death value of the consideration received by the decedent from the transaction that remains in his estate, <u>see</u> sec. 2033;[18]

$FMV_d$ = fair market value at date of death of property transferred by the decedent whose value is included in the gross estate under section 2036; and

$C_t$ = consideration received by the decedent at the time of the transfer, which has to be subtracted under section 2043(a).

To see how this works, let's look at a few examples. We'll start with the simplest and work toward one that echoes what we have here.

*Example 1: Constant Values.* Imagine a parcel of land worth $1000. Its aging owner transfers its ownership to a FLP in which his partnership interest is worth $500, but he keeps a life estate. What's included in his gross estate is $1000, computed as the partnership interest valued at $500 when he died (and thus

_____

[18] Or, of course, the alternative valuation date. <u>See</u> sec. 2032(a).

**[*43]** included in his estate under section 2033), plus $1000 (the value of the land as of the date of death), minus $500 (the value of the partnership interest when he received it). If the decedent hadn't done the transaction the $1000 parcel would be in his estate; the Code essentially nullifies the bargain sale's effect on the value of the gross estate.

This was more or less the situation in Estate of Powell. The result seems sensible. As we pointed out in that case, however, problems can arise when the value of the transferred asset fluctuates between the time of transfer and the time of death. Estate of Powell v. Commissioner, 148 T.C. at 408 n.7.

Let's turn to those.

*Example 2: Inflating Values.* Now consider the same facts as in the first example, but the value of the land and the FLP share doubles between the time of transfer and the date of death. The now $1000 FLP interest stays in the estate under section 2033; but one must add another $2000 to the estate because the fair market value of the land is also measured as of the date of death. The result is the inclusion of $2500 in the estate: $1000 + $2000 - $500. This might be thought to be less sensible: If the decedent had kept the land, only $2000 would be in his gross estate.

[*44] *Example 3:  Declining Values.*  Again, the same facts but the land and the

FLP share halve in value.  The FLP interest is worth only $250 at the date of death

and the land is worth only $500.  What's included in the gross estate?  $250 +

$500 - $500 = $250, instead of $500.  This makes the decedent who does the

transaction better off than one who doesn't.

   And now we can introduce discounted FLP interests.

   *Example 4: Discounted Interest, But Simple.*  This example will have

slightly different facts.  There is still a piece of land worth $1,000 and the aging

owner transfers it to a FLP.  However, this time, the aging owner's son contributes

a peppercorn to the FLP as well.  Under the partnership agreement the son is the

general partner and the aging land owner is the limited partner.  Father and son

agree that this triggers a 25% discount for lack of control, and the value of the

father's partnership interest sinks to $750.  Under the formula, the estate would

include $750 for the FLP interest (under section 2033), $1000 for the transferred

land (under section 2036), but with $750 subtracted (under section 2043).[19]

---

[19]  The attentive reader will notice that this renders any fight between an estate and the Commissioner about the value of the FLP about the proper discounts for lack of control and lack of marketability moot--what gets added under section 2033 just gets offset by what's subtracted under section 2043.  At least in this simple scenario.

[*45] *Example 5: Discounted Interest, But Not Simple.* Now assume the same facts as example 4 except this time the FLP sells the land for $1000. Then, the FLP makes a distribution of $400 back to the aging father. Under the formula this produces a strange result. Included in the estate is $400 cash (section 2033), $450 for the FLP interest (section 2033),[20] $1000 for the transferred land (section 2036), less $750 (section 2043)--in all the estate now has a value of $1100. Had the aging man just sold the land he would have only $1000 in his estate.

Some of these examples thus lead to what may seem odd results, but we must nevertheless apply the Code as it is written and interpreted in a Division Opinion. See Sec. State Bank v. Commissioner, 111 T.C. 210, 213 (1998), aff'd, 214 F.3d 1254 (10th Cir. 2000); Hesselink v. Commissioner, 97 T.C. 94, 99-100 (1991); Nihiser v. Commissioner, T.C. Memo 2008-135, 95 T.C.M. (CCH) 1531, 1534 (2008).

And there's one last thing to note--the variable $C_d$ is not limited by tracing rules. This means that whatever is left of the original consideration in an estate is included, but so are any proceeds from its later sale because section 2033 includes all property that a decedent owns in his gross estate. This also means that any

---

[20] $450 = $600 (what's left in the FLP after the $400 distribution) * 0.75 (to reflect the 25% discount).

**[\*46]** property that leaves an estate after a transfer governed by section 2036 but before a decedent's death is *not* generally included in the gross estate.

>   ii.     Application of Section 2043(a)

We can now begin to customize the equation to fit these cases. (We'll do this with verbal descriptions and leave the actual math to the parties under Rule 155.)

*FMV$_d$*. The fair market value of the farm was established by the sale to the Mellons. This was an arms-length sale to a third party, and neither the estate nor the Commissioner disputes that it sets the fair market value of the farm on both the date the price was agreed to and the date of sale. The transfer of four-fifths of the farm from the Living Trust to the FLP occurred at very nearly the same time as this sale. Moore then died less than two months later. We find it more likely than not that the fair market value of the farm did not change in so short a time. See, e.g., Cave Buttes, L.L.C. v. Commissioner, 147 T.C. 338, 355 (2016); Dunlap v. Commissioner, T.C. Memo 2012-126, 103 T.C.M. (CCH) 1689, 1709 (2012).

*C$_t$*. Section 2043 tells us to subtract from this value of the farm the value of the consideration that Moore received. We value this consideration on the date it was received. One-fifth of the value of the farm went directly to the Living Trust and is a matter of multiplication. But what of the remaining four-fifths? This is

**[*47]** the portion that went from the Living Trust to the FLP in exchange for an interest in the FLP. Here the parties' estimations diverge. The estate says that Moore got an interest in the FLP worth about $5.3 million; the Commissioner argues that it was worth about $8.5 million. Because of the brief time between the challenged transfer and Moore's death, we find it more likely than not that this value--whether it was $5.3 million or $8.5 million--did not change between the time Moore received it and the time he died. On the facts of these cases, then, we don't think this dispute matters because we would add back either figure after subtracting it.

With the value of the consideration that Moore received measured at the time he received it equal to the value of the consideration that remained in his estate at the time of his death, the equation thus far is:

(Either $5.3 million or $8.5 million + (.2 * value of farm at date of death)) + ((value of farm at date of death) - ((either $5.3 million or $8.5 million) + (.2 * value of farm at date of death))).

$C_d$. This variable, however, is not simply the value of the consideration from the challenged transaction. Section 2033 tells us to include only the value of that consideration that remains in the estate as of the date of Moore's death. To get to this number we have to look for any money that left that estate after the

[*48] farm's sale and before that date. There were three of these adjustments to the $C_d$ variable that the parties identified and argued about:

- unpaid attorney's fees,

- transfers to Moore's children, and

- $2 million dollar purported loan.

Let's look at these.

i.     *Unpaid Attorney's Fees*

After the farm's sale Moore paid an outstanding balance of $220,000 to Hahn. Some of this came from the FLP's share of the proceeds. In performing the computations under Rule 155, the parties should take care to reflect this reduction in their calculation of $C_d$.

ii.     *Transfers to Moore's Children*

The parties argue about this as a question of characterization--were these transfers gifts or loans? Again, under the reading of the Code which we make today, that wouldn't matter too much. If the transfers were gifts, they would fall out of Moore's gross estate but would still be subject to gift tax. If they were true loans, they would be assets of the estate subject to estate tax, but not gift tax.

It is conceivable that this might make a difference, so we will analyze the question. The Commissioner asserts that Moore's transfers to his children were

**[\*49]** gifts and not loans because they lack a legitimate debtor-creditor relationship.  "A purported loan between family members is always subject to close scrutiny. * * * The presumption, for tax purposes at least, is that a transfer between family members is a gift."  Perry v. Commissioner, 92 T.C. 470, 481 (1989), aff'd without published opinion, 912 F.2d 1466 (5th Cir. 1990).  The presumption may be rebutted upon a showing that the transferor had a real expectation of repayment and an intention to enforce the debt.  Estate of Van Anda v. Commissioner, 12 T.C. 1158, 1162 (1949), aff'd, 192 F.2d 391 (2d Cir. 1951).  A promise to pay money in the future coupled with an implied understanding that the promise will not be enforced does not create a true debtor-creditor relationship.  As we held in Estate of Maxwell v. Commissioner, 98 T.C. 594, 605 (1992), aff'd, 3 F.3d 591 (2d Cir. 1993), "a stated obligation to pay a fixed sum of money may be disregarded as having no value where the facts show that the parties did not contemplate that the obligation would be met."

Whether there's a true loan is a question of fact, and we have several factors to help determine whether a transfer creates a *bona fide* debt:

- the name given to the instrument underlying the transfer of funds;

- the presence or absence of a fixed maturity date and a schedule of payments;

- the presence or absence of a fixed interest rate and actual interest payments;

- the source of repayment;

- the adequacy or inadequacy of capitalization;

- the identity of interest between creditors and equity holders;

- the security for repayments;

- the transferee's ability to obtain financing from outside lending institutions;

- the extent to which repayment was subordinated to the claims of outside creditors;

- the extent to which transferred funds were used to acquire capital assets; and

- the presence or absence of a sinking fund to provide repayment.

Estate of Rosen, 91 T.C.M. (CCH) at 1236; see also Zimmerman v. United States, 318 F.2d 611, 613 (9th Cir. 1963); Hubert Enters., Inc. v. Commissioner, 125 T.C. 72, 92 (2005), aff'd in part, rev'd in part on other grounds and remanded, 230 F. App'x 526 (6th Cir. 2007).

We do find it more likely than not that these were gifts:

- Each of Moore's children signed a note promising to pay back to the FLP $500,000 on or before February 2010. Interest on the purported loans was set at 3.56% *per annum*. This factor weighs in favor of a finding that the transfer of the FLP funds created a *bona fide* debt. But . . .

- The promissory notes have no fixed payment schedule. This factor weighs against a finding of *bona fide* debt. See Roth Steel Tube Co. v. Commissioner, 800 F.2d 625, 631 (6th Cir. 1986), aff'g T.C. Memo. 1985-58; Estate of Rosen v. Commissioner, 91 T.C.M. (CCH) at 1237.

- Moore's children have never paid any interest on the loans despite the notes' requirement to do so. The estate asserts that Moore's children simply did not understand the terms of the loans, but during trial they testified that Hahn had advised them that they did not need to make payments. The FLP has never demanded repayment. These facts persuade us that Moore's children did not intend to make interest payments and the facts weigh strongly against a finding of *bona fide* debt. See Roth Steel Tube Co., 800 F.2d at 631; Estate of Rosen, 91 T.C.M. (CCH) at 1237.

- Lynda testified that she intended to pay back the loan to the FLP with FLP assets--assets currently unavailable as a result of the estate's litigation with the Commissioner. Repayment that depends solely on earnings does not support a finding of *bona fide* debt. Roth Steel Tube Co., 800 F.2d at 632; Estate of Rosen, 91 T.C.M. (CCH) at 1237.

- The record does not provide any evidence that Moore's children had the resources to repay the loans. Thin or inadequate capitalization to fund a transferee's obligations weighs against a finding of *bona fide* debt. Estate of Rosen, 91 T.C.M. (CCH) at 1237-38.

- There is a disproportionate ratio between Moore's children's ownership interests in the FLP and the debt they owe to it--this tends to weigh in favor of a *bona fide* debt. See id. at 1238.

- The promissory notes signed by Moore's children were not secured--this weighs strongly against a finding of *bona fide*

**[*52]**      debt.  See <u>Roth Steel Tube Co.</u>, 800 F.2d at 632; <u>Estate of Rosen</u>, 91 T.C.M. (CCH) at 1238.

● Given that Moore's children did not have any security for the purported loans, and the absence of any evidence that they had the resources to repay the loans, we do not believe that they would have been able to obtain comparable funding from another lender.  This weighs against a finding of *bona fide* debt.  See <u>Roth Steel Tube Co.</u>, 800 F.2d at 631; <u>Estate of Rosen</u>, 91 T.C.M. (CCH) at 1238.

● Because the funds from the FLP were unsecured, they would have been subordinate to other claims.  But without any known creditors of Moore's children this factor is either inapplicable or weighs slightly against the finding of *bona fide* debt.  See <u>Estate of Rosen</u>, 91 T.C.M. (CCH) at 1238.

● There is very little on the record regarding the children's use of the funds though the estate contends that the children made very poor investments.  We will give this factor little weight.

● Nothing on the record suggests that Moore's children set aside funds--aside from their plan to use FLP assets to repay their debts to the FLP--to repay their notes.  This weighs against a finding of *bona fide* debt.  See <u>Roth Steel Tube Co.</u>, 800 F.2d at 632; <u>Estate of Rosen</u>, 91 T.C.M. (CCH) at 1238.

We pick a path through the prongs to what we think is the most important fact of all--Moore listed a desire for each of his children to *receive* $500,000 as one of his estate planning goals.  Hahn even testified that the payments needed to be loans for tax purposes--that "having [them] as a gift wouldn't be the best use of the tax laws."  We find Hahn credible on this point to the very limited extent that

[*53] we agree that it would benefit the estate to make the transfers *look* like loans. But we also find that Moore's intent to make gifts and the children's course of conduct that treated the transfers as gifts mean that those transfers were not in fact loans.

Based on our review of the record, we find that the $500,000 transfers of FLP funds to Moore's children were not loans but gifts subject to section 2501 to the extent that they exceed the exclusion under section 2503(b). Additionally, because the gifts to his children were made within the three-year period preceding Moore's death, the gross estate is increased by the value of tax paid on these gifts.[21] See sec. 2035(b).

We find for the Commissioner on this issue.

### iii. *$2 Million Purported Loan*

The estate did not address this issue on brief, and we could deem it abandoned. See Nicklaus v. Commissioner, 117 T.C. 117, 120 n.4 (2001); see also Rybak v. Commissioner, 91 T.C. 524, 566 n.19 (1988). But even if we were to consider it, we would find that this was not a deductible loan, but instead a

---

[21] Section 2035(b) states that the "amount of the gross estate * * * shall be increased by the amount of any tax paid under chapter 12 by the decedent or his estate on any gift made by the decedent or his spouse during the 3-year period ending on the date of the decedent's death."

**[\*54]** distribution from the FLP and subsequent expenditure.  This means a reduction in the $C_d$ variable either way.

If it makes a difference, however, we specifically find that this debt was not *bona fide*.  A taxpayer must prove that when the funds were disbursed there was an "unconditional obligation and intent on the part of the transferee to repay the money and an unconditional intent on the part of the transferor to secure repayment."  Estate of Rosen, 91 T.C.M. (CCH) at 1236; see also Busch v. Commissioner, 728 F.2d 945, 948 (7th Cir. 1984), aff'g T.C. Memo. 1983-98; Haag v. Commissioner, 88 T.C. 604, 615-16 (1987), aff'd, 855 F.2d 855 (8th Cir. 1988).

There is very little on the record that indicates that the $2 million transfer from the FLP to the Living Trust was a loan:  Lynda testified during trial that she "believed" the FLP had lent Moore money but was unaware of any details, even though the estate tax return reflects the payment as a loan.  Other than that, there is nothing.  There is no evidence in the record that there was ever a promissory note, that the FLP ever charged interest or the Living Trust ever paid it, or that there was any collateral for the loan.  It also appears that there was no maturity date on the loan and that no payments were made.  As of the date of trial there has never been a demand for repayment.  The estate simply did not meet its burden.

[*55] We, therefore, find that the estate is not entitled to deduct the $2 million payment as a loan. On the other hand, we do find that Moore spent this money before he died, mostly on income tax that he owed on the sale of the farm. It should not be included in his taxable estate under section 2033.[22]

The final equation:

((Either $5.3 million or $8.5 million + (.2 * value of farm at date of death)) - (money that left the estate between the time of the sale and Moore's death)) + ((value of farm at date of death) - ((either $5.3 million or $8.5 million) + (.2 * value of farm at date of death))). We can then simplify the equation to:

(The value of the farm at date of death) - (money that left the estate between the time of the sale and date of death).

B.    Contested Deductions

Now that we've figured out what is included in Moore's gross estate, we turn to the deductions that the estate claimed but which the Commissioner disallowed. Section 2053 allows deductions from the value of the gross estate for funeral expenses, administration expenses, claims against the estate, and any unpaid debt. A decedent's estate is also entitled to deductions for bequests made

---

[22] As the Commissioner notes, the Moore children themselves kicked in $400 at the FLP's inception. See supra p. 14. The parties should make a small adjustment in their Rule 155 computations so this is not taxed.

[*56] to charities.  See sec. 2055.  In these cases, the estate and the Commissioner disagree about whether the estate is entitled to a charitable deduction for the additional amount that the Irrevocable Trust may be required to transfer to the Living Trust after Moore's death.  They also disagree about whether the attorney's fees claimed on Moore's estate tax return were actually incurred in the administration of his estate and whether they are unreasonable in amount.

1.    Future Charitable Contribution Deductions

The Commissioner argues that the estate is not entitled to an increase in charitable deductions as a result of any increase in the value of Moore's estate.  The estate, however, points to article 5, section 2 of the Irrevocable Trust.  That section directs the Irrevocable Trust's trustees to distribute funds to the Living Trust to allow the Living Trust to move money to the Charitable Trust to enable the estate to take additional charitable deductions thereby minimizing its estate tax.

There are two problems for the estate here.  The first is a very specific problem in the actual language of the Irrevocable Trust, which doesn't speak of increased value, but instead speaks of "an amount equal to the value of any asset *of this trust* which is includible in my gross estate for federal estate tax purposes" (emphasis added).  The asset's value that we find is includible in Moore's gross

**[\*57]** estate is his farm, and his farm is *not* an asset of the Irrevocable Trust--it's an asset of the Mellons now and was in part an asset of the FLP. All the Irrevocable Trust owns is a large chunk of that FLP, not that partnership's assets.

There is also a second, much more general problem here. Charitable deductions are allowed only for the value of property in a decedent's gross estate if transferred to a charitable donee "by the decedent during his lifetime or by will." Sec. 20.2055-1(a), Estate Tax Regs. We have repeatedly denied charitable deductions where the donation turned upon the actions of the decedent's beneficiary or an estate's executor or administrator. See, e.g., Estate of Engelman v. Commissioner, 121 T.C. 54, 70-71 (2003); Estate of Marine v. Commissioner, 97 T.C. 368, 378-79 (1991), aff'd, 990 F.2d 136 (4th Cir. 1993).

Charitable deductions must be ascertainable at a decedent's date of death. Ithaca Tr. Co. v. United States, 279 U.S. 151, 154 (1929) (transfers to a charity must be "fixed in fact and capable of being stated in definite terms of money"); Estate of Marine, 97 T.C. at 375. Section 20.2055-2(b)(1), Estate Tax Regs., states:

> If, as of the date of a decedent's death, a transfer for charitable purposes is dependent upon the performance of some act or the happening of a precedent event in order that it might become effective, no deduction is allowable unless the possibility that the

**[*58]** charitable transfer will not become effective is so remote as to be negligible.

Whether the Living Trust would get additional funds from the Irrevocable Trust to transfer to the Charitable Trust was not ascertainable at Moore's death but only after an audit by the Commissioner, followed by a determination that additional property should be included in Moore's estate, followed by either the successful defense of that position or the estate's acquiescence to his determinations. For the exception to apply, it would have to have been almost certain that the Commissioner would not only challenge, but also successfully challenge the value of the estate. We do not think that's a reasonable conclusion.

The estate likens its facts to those of Estate of Christiansen v. Commissioner, 586 F.3d 1061 (8th Cir. 2009), aff'g 130 T.C. 1 (2008), and Estate of Petter v. Commissioner, 653 F.3d 1012 (9th Cir. 2011), aff'g T.C. Memo. 2009-280. In Estate of Christiansen v. Commissioner, 586 F.3d at 1062-63, even though the amount of the property to be transferred was subject to change based on a formula clause, we allowed a charitable deduction because the transfer itself was not contingent on the happening of some event.

In Estate of Petter, a FLP was to distribute LLC units to the trusts that Ms. Petter had set up for each of her children. The trusts were to receive a specific

**[*59]** number of units up to a set dollar amount, with any units over that set value going to charity. Estate of Petter, 653 F.3d at 1020. Since the value of these units was unknown (because it was based on the FMV of stock held by the FLP), id., if a subsequent audit by the Commissioner led to a revaluation of the units then some of those units that had already been transferred to trusts had to be retransferred to the charitable donee in accordance with the trust provisions, id. at 1019. As in Estate of Christiansen, value was at issue, but not whether there would be a transfer to the donee at all. Estate of Petter, 653 F.3d at 1018.

Article 5, section 2 of Moore's Irrevocable Trust does not say that the Living Trust will receive a transfer of assets of unknown value. It says that whether the Living Trust will even receive a transfer of assets is unknown--contingent on an examination by the Commissioner. This is unlike Estate of Christiansen, where we *knew* the charity would get a transfer of assets, just not the value, or Estate of Petter, where we *knew* the charity would get some transfer of value, just not how much. Here, we *don't know* if the charity would get any additional assets at all.

**[\*60]** We, therefore, deny any charitable deduction for funds that might be transferred to the Charitable Trust under article 5, section 2 of the Irrevocable Trust.[23]

### 2.    Attorney's Fees

The second contested deduction is for a very large fee that the estate paid Hahn.  Attorney's fees that are actually and necessarily incurred in the administration of the decedent's estate are generally deductible from the estate's gross value.  Sec. 2053(a)(2).  These fees may not exceed a reasonable remuneration for services rendered.  Sec. 20.2053-3(c)(1), Estate Tax Regs.  The estate bears the burden of proof on reasonableness.  See Rule 142(a)(1).  There are two hurdles to clear--the fees must be allowable under local law and the expenses have to meet a series of conditions listed in the regulations.  See Estate of Reilly v. Commissioner, 76 T.C. 369, 372 (1981).

Since all the relevant events took place in Arizona, we first took to see whether the fees are allowable under Arizona law.  Arizona courts look at several factors.  They consider:

---

[23]    As an alternate argument, the Commissioner contends that even if the article 5, section 2 clause is valid, the Irrevocable Trust lacks the assets to donate a sum large enough to eliminate the estate tax.  We need not address that issue here.

**[\*61]** ● the advocate's ability, training, education, experience, and skill;

● the difficulty, intricacy, and importance of the work and the time and skill required to do it;

● the actual work completed; and

● the result.

Schwartz v. Schwerin, 336 P.2d 144, 146 (Ariz. 1959); Hunt Inv. Co. v. Eliot, 742 P.2d 858, 862-63 (Ariz. Ct. App. 1987) (upholding the trial court's use of the Schwartz factors to determine the amount of fees awarded).

We know very little about Hahn and the work he completed on the administration of the estate. The only information we have about his experience is his own testimony that he's been practicing for 15 years and that he specializes in estate planning. There is nothing on the record to show the intricacy of the work or the time put in. Hahn's fee was a flat fee. He did not submit to the estate, and the estate did not submit to us, a breakdown of the number of hours he spent. When given the opportunity during trial to *describe* the work he performed on the estate, he was vague and testified only that his work continues to this day. The estate just listed the full amount of fees on its Schedule J. There were no claims against Moore's estate that Hahn would have had to settle, and all of Moore's

[*62] interest in property was already part of the Living Trust, so it's unclear what administration Hahn is responsible for.

The estate points us to <u>Estate of Baird v. Commissioner</u>, T.C. Memo. 1997-55, 73 T.C.M. (CCH) 1883 (1997), to support its contention that a 4% administrative fee on an estate is not unreasonable. Its arguments are misguided. In <u>Estate of Baird</u>, we did not allow attorney's fees *because* they were under 4% of the total estate. <u>See</u> <u>id.</u> at 1885-86. Rather, we, upon a strong showing of evidence including the amount of billable hours and type of work performed, found that a total fee of 2.09% was in line with fees in other New York cases that "have held that a fee award equal to 3 percent of the gross estate is facially reasonable." <u>Id.</u> at 1885. And while it does appear that New York courts will at least consider the reasonableness of fees based on a percentage of the gross estate, Arizona law requires us to balance the factors that we've listed and use "good judgment" to decide what weight we give to each factor. <u>See</u> <u>Schwartz</u>, 336 P.2d at 146. Absent any evidence that Hahn's fees were necessarily incurred in the administration of the estate, or if they were, why they were so high, we won't allow the estate to deduct them. <u>See</u> <u>Estate of Goldberg v. Commissioner</u>, T.C. Memo. 2010-26, 99 T.C.M. (CCH) 1120, 1122 (2010); <u>Estate of Silvester v. Commissioner</u>, T.C. Memo. 1977-439, 36 T.C.M. (CCH) 1815, 1821 (1977).

**[*63]** We have no doubt that computations will be difficult, and

Decisions will be entered under

Rule 155.